Eloise FOMBY–DENSON, Petitioner,

v.

DEPARTMENT OF the ARMY, Respondent.

No. 00–3112.

United States Court of Appeals, Federal Circuit.

May 3, 2001.

Diana J. Veilleux, Shaw, Bransford, Vielleux & Roth, of Washington, DC, argued for petitioner. With her on the brief was Christopher M. Okay.

Elizabeth G. Candler, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With her on the brief were David M. Cohen, Director; and Deborah A. Bynum, Assistant Director.

Before CLEVENGER, LINN, and DYK, Circuit Judges.

DYK, Circuit Judge.

This case presents the question of whether a settlement agreement bars the United States from making criminal referrals of the federal employee's conduct underlying the settlement agreement. We hold that such a construction of the settlement agreement would render the agreement unenforceable as a matter of public policy, and that the agreement should accordingly be construed to permit the referrals. We thus affirm, albeit on different grounds, the Merit Systems Protection Board's decision in *Fomby–Denson v. Department of the Army*, No. DC–0752–97–0940–C–1, 84 M.S.P.R. 618 (M.S.P.B. Oct.21, 1999).

## BACKGROUND

In 1991, the United States Army ("Army") hired Ms. Eloise Fomby–Denson ("petitioner"), a United States citizen, as an Army Family Advocacy Program Coordinator at an Army base in the Federal Republic of Germany ("Germany"). On or about April 8, 1997, the base's Case Review Committee [1] determined that the petitioner was responsible for an act of child neglect, and accordingly reassigned her to duties unrelated to her position with the Army Family Advocacy Program.

---

1. The record does not define or otherwise describe the responsibilities of the "Case Review Committee."

On June 11, 1997, the Army sent the petitioner a Notice of Proposed Removal from her position. The Army based its proposal on the impending expiration (in July of 1997) of the petitioner's tour of duty in Germany, as well as the incident of child neglect, which the Army termed "incompatible with the duties of an Army Family Advocacy Program Coordinator."

On June 23, 1997, the Army amended its Notice of Proposed Removal to include an additional charge arising from the petitioner's provision on April 23, 1997, of an allegedly forged rotation agreement. That agreement ostensibly extended the petitioner's tour of duty in Germany through December 15, 1998. The Army determined, however, that the signature of the authorizing official appearing on the rotation agreement had been forged. On July 16, 1997, the Army terminated the petitioner effective August 1, 1997.

Ms. Fomby–Denson appealed her termination to the Merit Systems Protection Board ("Board" or "MSPB") on August 26, 1997, and apparently lodged separate complaints with the Equal Employment Opportunity Commission ("EEOC"). On June 18, 1998, the petitioner and the Army entered into a settlement agreement, in which the Army agreed, *inter alia*, to cancel its termination of Ms. Fomby Denson; to place her on leave-without-pay ("LWOP") status from August 2, 1997 through August 1, 1999; and to pay her a lump sum of $85,000 (of which $50,542 was for attorneys' fees and costs). Ms. Fomby–Denson, in turn, agreed to withdraw her Board appeal and EEOC complaints, and to voluntarily resign her position with the Army, effective August 1, 1999.

The Preamble to the agreement provided, in pertinent part, that "[t]his agreement constitutes a full, complete and final settlement of all differences and controversies between the parties in connection" with petitioner's Board appeal. Other provisions of the agreement provided that the Army would purge petitioner's official personnel file of all records relating to her termination, and that the terms of the agreement "shall not be publicized or divulged in any manner, except as is reasonably necessary to administer its terms." On June 25, 1998, the administrative judge entered the settlement agreement into the record and dismissed petitioner's appeal. *Fomby–Denson v. Dep't of the Army*, No. DC–0752–97–0940–I–3 (M.S.P.B. June 25, 1998).

On July 13, 1998, counsel for the Army referred the allegations of Ms. Fomby–Denson's forgery of the rotation agreement to local German law enforcement authorities for investigation and possible prosecution. That correspondence also disclosed some of the terms of the settlement agreement, stating, in pertinent part, that:

> For the sake of providing a complete record of the information offered, it should also be mentioned that the legal proceedings before the United States Labor Court ended with a settlement, in accordance with which Ms. Fomby–Denson is to go on vacation from August 1, 1997 until July 31, 1999, during which period she is not to receive any salary or related benefits. Her ID card was revoked. In addition, Ms. Fomby–Denson received a payment of $80.000,00 (out of which $55.000,00 went towards the legal expenses) [sic].... However, it should be noted that the foregoing settlement did not preclude criminal proceedings.

On July 16, 1998, counsel for the Army also communicated information to the German immigration authorities that had potentially criminal consequences for Ms. Fomby–Denson. In correspondence captioned "Authorization of Residence for Ms. Eloise Fomby–Denson," counsel for the

Army notified German immigration authorities that "Ms. Fomby–Denson is no longer employed with the United States Army, and therefore can no longer derive any direct Authorization of Residence" in Germany from her position with the Army. That correspondence also notified the immigration authorities of the Army's July 13, 1998, criminal referral, and recounted those terms of the settlement agreement disclosed to the German law enforcement authorities in that referral.[2]

Ms. Fomby–Denson learned of the July 13, 1998, criminal referral on August 6, 1998, at a meeting at the Army base with her German counsel and German local law enforcement authorities.[3] The meeting was apparently prompted not only by the Army's referral of the forgery allegations but also by separate allegations that Ms. Fomby–Denson had not settled certain outstanding medical bills. Indeed, in a signed document dated August 6, 1998, and captioned "Memorandum for Record," Ms. Fomby–Denson stated that the German authorities at that meeting "wanted to get an understanding of the medical bills, and information about my health insurance. It is a crime in Germany not to pay your bills."

At that meeting, the petitioner apparently requested that the German authorities provide her with a copy of the Army's criminal referrals. They refused, but informed her that her attorneys could request a copy. Later that day, Ms. Fomby–Denson's counsel requested that the Army:

Please inform us immediately in writing if any Department of the Army employee initiated a request with any German authority for an investigation into the allegation that Ms. Fomby–Denson forged a rotation agreement. If so, we request that the Army immediately withdraw its request for an investigation into these allegations.

The Army declined to withdraw the referrals, stating, in pertinent part, that:

We have always had an obligation to the German government to report suspected criminal violations of German law and only refrained, in your client's case, because the MSPB case was pending and we believed she would be losing her eligibility to remain in Germany as a result of those proceedings. When the settlement was reached and the possibility arose of her remaining for another year under U.S. sponsorship, we had no reason to continue to withhold this information from the German authorities information which is clearly relevant to their decision on whether to allow her to remain. Other than making a truthful report of what had happened, the U.S. Army has had no involvement in any German investigation. . . . Moreover, we have no authority to interfere now in the German government's investigation of an incident that they apparently also consider serious enough to take action on.

On August 11, 1998, Ms. Fomby–Denson filed with the Board a petition for enforcement of the settlement agreement and a corresponding motion for sanctions. In

---

2. The record does not disclose the results, if any, of the Army's July 13, 1998, referral. As for the July 16, 1998, referral, it appears that the German immigration authorities initially informed the German police that Ms. Fomby–Denson was residing illegally in Germany. Following an investigation, however, the German immigration authorities granted her a residence permit valid through September 30, 1999.

3. The record does not indicate whether at this meeting the petitioner also learned of the July 16, 1998, referral to the German immigration authorities.

her petition, Ms. Fomby–Denson argued, *inter alia*, that the Army's criminal referrals breached the Preamble and section B.1 of the settlement agreement set forth below.

In an Initial Decision, the administrative judge denied the petition and motion. *Fomby–Denson v. Dep't of the Army*, No. DC–0752–97–0940–C–1 (M.S.P.B. Dec.8, 1998). In denying the petition for enforcement, the administrative judge ruled that neither the Preamble nor section B.1 barred the Army "from taking any independent *criminal* action against the [petitioner] concerning one of the same instances of misconduct charged in the initial removal action.... Nor did the agency in either of the above provisions agree not to inform the German government of the [petitioner's] status there." *Id.*, slip op. at 3–4 (emphasis in original). In denying the motion for sanctions, the administrative judge further stated that she had found no evidence of "noncompliance or improper action by the agency with regard to the agreement." *Id.*, slip op. at 10.

On January 14, 1999, Ms. Fomby–Denson filed a petition for review of the administrative judge's Initial Decision. She subsequently filed at least two motions to re-open the record to admit copies (and corresponding translations into English) of the Army's July 13 and 16, 1998, referrals to the German authorities. In at least one of those motions, petitioner characterized those referrals and the accompanying translations as new and material evidence of the Army's breach of not only the Preamble and section B.1 of the settlement agreement, but also of that agreement's confidentiality provision set forth below.[4]

On October 21, 1999, the full Board denied the petition for review, concluding that "there is no new, previously unavailable, evidence and that the administrative judge made no error in law or regulation that affects the outcome" of Ms. Fomby–Denson's petition for enforcement of the settlement agreement. *Fomby–Denson v. Dep't of the Army*, No. DC–0752–97–0940–C–1, 84 M.S.P.R. 618 (M.S.P.B. Oct.21, 1999). This timely petition followed.

## DISCUSSION

### I

█ This court will affirm a decision of the Board unless we find it to be: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (1994); *Chase–Baker v. Dep't of Justice*, 198 F.3d 843, 845 (Fed.Cir.1999). We review without deference the Board's construction of a settlement agreement. *Massie v. United States*, 166 F.3d 1184, 1187 (Fed.Cir.1999).

### II

Ms. Fomby–Denson argues that the Army's criminal referrals to the German law enforcement authorities breached three separate provisions of the settlement agreement.

First, petitioner points to the Preamble to that agreement, which provides, in pertinent part, that:

---

4. The petitioner apparently obtained copies of the referrals from the German authorities on or about March 31, 1999, well after the record closed before the Board. (She obtained English translations of the referrals from a commercial translation service on or about May 20, 1999.) The record does not disclose when petitioner's counsel requested those referrals from the German authorities. Nor does it indicate whether petitioner ever asked the Army for copies of those referrals.

*This Agreement constitutes a full, complete and final settlement of all differences and controversies between the parties* in connection with the appeal of Eloise Fomby–Denson ... to the Merit Systems Protection Board, Docket No. DC–0752–97–0940–I–1, challenging her removal from the Federal Service at Hohenfels, Germany by the Department of Defense (Agency). All parties agree that nothing in this document shall be construed as an admission of wrongdoing or of any violation of law or regulation by either party.

(Emphasis added.) Petitioner characterizes the Army's referrals to the German authorities as a revival of its forgery allegations against her, and urges that the referrals accordingly contravene the Army's agreement to settle "all differences and controversies" surrounding the alleged forgery.

Second, Ms. Fomby–Denson argues that the referrals violated section B.1 of the settlement agreement, which provides for the Army's purging from her official personnel file of all records relating to her removal:

The Agency agrees to cancel the action terminating [petitioner] from the position of Family Advocacy Program Coordinator ... that was effective August 1, 1997. The Agency agrees to remove from [petitioner's] Official Personnel File (OPF) all reference to the removal action and to the charges that were the basis for the action. The Agency also agrees to purge [petitioner's] OPF of any Letters of Counseling or Letters of Reprimand which may be contained there.

Petitioner also directs our attention to our decision in *Pagan v. Department of Veterans Affairs*, 170 F.3d 1368 (Fed.Cir. 1999), where we held that the government breached a provision in a settlement agreement (similar to the provision at issue here) when it provided arguably disparaging information regarding the employee to a potential employer. *Pagan* did not involve the situation here of the reporting of possible criminal conduct to law enforcement authorities. However, relying on *Pagan*, the petitioner urges that the Army, like the agency in *Pagan*, "was required to act, in matters relating to [petitioner] as if [s]he had a 'clean record.'" *Id.* at 1371–72. The criminal referrals, argues petitioner, accordingly constitute a breach of section B.1 of the agreement.

Finally, section D of the agreement, entitled "Confidentiality," provides that "[t]he parties agree that the terms of this agreement shall not be publicized or divulged in any manner, except as is reasonably necessary to administer its terms." Petitioner argues that the Army breached this provision when it needlessly disclosed the existence of the settlement agreement and some of its terms (including the monetary award) to the German law enforcement authorities.

Ms. Fomby–Denson argues that the appropriate remedy for these alleged breaches is a court order requiring the Army to withdraw its referrals to the German authorities and an award of attorneys' fees and costs. In the alternative, she seeks to rescind the settlement agreement and reinstate the Board appeal of her termination.

The government responds that the plain text of the agreement did not foreclose the possibility of referrals by the government of Ms. Fomby–Denson to the German authorities, though it necessarily admits that the agreement also did not explicitly permit such referrals and that the confidentiality provision might have been violated by the disclosure of the settlement agreement and the terms of that agreement.

■ On its face the agreement is ambiguous as to whether it encompasses the referrals to the law enforcement authorities. We conclude, however, that the disposition of this appeal does not hinge on the issue briefed by the parties, namely, whether the language and history of the settlement agreement bars the Army from referring Ms. Fomby–Denson's alleged misconduct to the German authorities. Rather, this case presents a threshold question not briefed by the parties whether it would be contrary to public policy to construe a settlement agreement to bar the Army from referring Ms. Fomby–Denson to the German authorities. Although the parties on this appeal did not brief this issue, it is well-settled that "[e]ven if neither party's pleading or proof reveals the contravention [of public policy], the court may ordinarily inquire into it and decide the case on the basis of it if it finds it just to do so, subject to any relevant rules of pleading or proof by which it is bound." *Restatement (Second) of Contracts,* Intro. to ch. 8, topic 1, at 5 (1981). Notwithstanding *Securities Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we may therefore decide this appeal on a ground not considered by the Board.

■ As we have noted elsewhere, the "*Chenery* doctrine is not applied inflexibly," *Fleshman v. West,* 138 F.3d 1429, 1433 (Fed.Cir.1998). When the new ground is not one solely committed to the administrative agency, the *Chenery* doctrine does not compel a remand to permit the agency to make an initial decision on that ground. *Id.; see also, e.g., Koyo Seiko Co. v. United States,* 95 F.3d 1094,

1101 (Fed.Cir.1996); *Ward v. Merit Sys. Prot. Bd.,* 981 F.2d 521, 528 (Fed.Cir.1992). In this case, the question whether public policy stands in the way of enforcing a contract that would bar disclosure of a possible crime to appropriate authorities is surely not one that is solely committed to the expertise of the Board.

We conclude that the construction of the settlement agreement urged by petitioner would contravene public policy.[5]

## III

■ We start with the well-settled proposition that "[i]t is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law." *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947); *see also, e.g., Reading Steel Casting Co. v. United States,* 268 U.S. 186, 188, 45 S.Ct. 469, 69 L.Ed. 907 (1925) ("The [government] contract is to be construed and the rights of the parties are to be determined by the application of the same principles [of contract law] as if the contract were between individuals."); *Societe Anonyme Des Ateliers Brillie Freres v. United States,* 160 Ct.Cl. 192, 199 (1963) ("As in most questions of government contract law where the Congress has not given us a statutory standard it is customary to apply the principles of general contract law.") (citing *Priebe & Sons Inc.,* 332 U.S. at 411, 68 S.Ct. 123). In short, the "principles of general contract law," *Priebe & Sons, Inc.,* 332 U.S. at 411, 68 S.Ct. 123, which be-

---

5. In reaching this decision, we considered the documents submitted by Ms. Fomby–Denson to the full Board in support of her petition for review of the administrative judge's Initial Decision, namely, the Army's referrals to the German authorities and the corresponding English translations, without deciding whether these documents were properly before the Board.

come federal common law,[6] govern our construction of the settlement agreement at issue on this appeal.

█ It is equally well-settled in the principles of general contract law that courts may not enforce contracts that are contrary to public policy. In *McMullen v. Hoffman*, 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117 (1899), for example, two bidders for a municipal government contract submitted separate bids without revealing that they had agreed to share the work equally if one of them was awarded the contract. One of the parties secured the contract and the other sued to enforce their agreement to share the work. The Supreme Court found that agreement unenforceable as contrary to public policy:

> [T]o permit a recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest.

*Id.* at 669, 19 S.Ct. 839.

Subsequent decisions of the Supreme Court have applied this principle to declare unenforceable United States government contracts. *See, e.g., United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) (approving cancellation of government contract for violation of federal conflict-of-interest statute, now codified at 18 U.S.C. § 208, because "the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied" in that statute); *United States v. Acme*

*Process Equip. Co.*, 385 U.S. 138, 146, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) (upholding government's cancellation of prime contract due to the payment of kickbacks by subcontractor, because those kickbacks "clearly were violative of the public policy against kickbacks" underlying the Anti Kickback Act, now codified at 41 U.S.C. § 51 *et seq.*).

The Supreme Court has also refused to enforce private contracts on grounds of public policy. *See, e.g., Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 262, 29 S.Ct. 280, 53 L.Ed. 486 (1909) (declining to enforce private contract "not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties"); *Hurd v. Hodge*, 334 U.S. 24, 34–35, 68 S.Ct. 847, 92 L.Ed. 1187 (1948) (declining to enforce racially restrictive covenant because, in part, "[t]he power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States.... Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power.").

█ This doctrine was summarized in *Hurd*, which recognized that enforcement is denied when such enforcement would be contrary to the "public policy of the United States as manifested in the Constitution, treaties, federal statutes and applicable legal precedents." 334 U.S. at 35, 68 S.Ct. 847. However, *Hurd* and these other public policy cases conflate two distinct concepts. First, there is the rule that the federal courts should refrain from enforcing both United States government and

---

**6.** *See Dureiko v. United States*, 209 F.3d 1345, 1356 (Fed.Cir.2000); *Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1298 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

private contracts when such enforcement would be contrary to the "public policy of the United States as manifested in the Constitution, treaties, [and] federal statutes ..." *Hurd,* 334 U.S. at 35, 68 S.Ct. 847. While the government suggests that the Status of Forces Agreement[7] signed by the United States and Germany required the reporting here, that is disputed, and we will assume that the Constitution, statutes and treaty obligations of the United States are not implicated.

 Second, as *Hurd* recognized in the same passage quoted above, the federal courts will refuse to enforce contracts where the public policy is reflected in "applicable legal precedents." 334 U.S. at 35, 68 S.Ct. 847. In other words, the federal courts, as a matter of contract law, will not enforce an agreement if the agreement would require violation of established public policy norms, even if enforcing the agreement would not violate a specific federal statute, treaty or constitutional requirement. This principle has particular force in cases involving United States government contracts where federal contract law is applied, *see Boyle v. United Technologies Corp.,* 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), and it is this latter concept that is implicated on this appeal.

 To declare a contract unenforceable on public policy grounds, however, courts must first determine that the public policy at issue is "well defined and dominant." *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (upholding arbitrator's interpretation of collective bargaining agreement, but recognizing that if that interpretation "violates some explicit public policy, we are obliged to refrain from

enforcing it"). That determination is to be made "by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* at 766, 103 S.Ct. 2177 (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)). We accordingly must ascertain the existence and scope of the public policy implicated by the construction of the settlement agreement urged by the petitioner.

## IV

We assume, as noted above, that there is no federal statute, treaty or constitutional requirement mandating the referrals to the German law enforcement authorities. We nonetheless conclude that the public policy interest at stake the reporting of possible crimes to the authorities is one of the highest order and is indisputably "well defined and dominant" in the jurisprudence of contract law. *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. 2177.

As the Supreme Court has noted, "[c]oncealment of crime has been condemned throughout our history. The citizen's duty to raise the 'hue and cry' and report felonies to the authorities was an established tenet of Anglo Saxon law at least as early as the 13th century." *Roberts v. United States,* 445 U.S. 552, 557, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980) (internal citations omitted). In *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), for example, the Court held that a journalist's agreement to conceal the criminal conduct of his news sources did not give rise to a testimonial privilege under the First Amendment. In reaching that decision, the Court reasoned, in part, that "it is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them

---

7. *Agreement between the Parties to the North Atlantic Treaty Regarding the Status of Their* Forces, June 19, 1951, 4 U.S.T. 1792, 199 U.N.T.S. 67.

from the standpoint of public policy." *Id.* at 696, 92 S.Ct. 2646. Noting that the first Congress had enacted a statute defining the common-law crime of misprision of felony (currently codified at 18 U.S.C. § 4),[8] the Court concluded that "[i]t is apparent from this statute, as well as from our history and that of England, that concealment of crime and agreements to do so are not looked upon with favor." *Id.* at 697, 92 S.Ct. 2646.

Given the magnitude of the public policy interest here, it is not surprising that contracts barring the reporting of crimes are held to be unenforceable. For example, in *Lachman v. Sperry–Sun Well Surveying Co.*, 457 F.2d 850 (10th Cir.1972), the defendant informed a third party of the plaintiff's possible misappropriation of certain oil and natural gas deposits belonging to the third party. The plaintiff sued for breach of a non-disclosure agreement. *Id.* at 851. The trial court dismissed the action on the basis that public policy " 'will never penalize one for exposing wrongdoing ...' " *Id.* at 852. The Tenth Circuit affirmed. That court declined to enforce the parties' contract, noting that:

> It is public policy in Oklahoma and everywhere to encourage the disclosure of criminal activity, and a ruling here in accordance with the argument advanced by appellant would serve to frustrate this policy.... By holding that appellee breached its contract we would, in effect, be placing others similarly situated in a precarious position. A party bound by contract to silence, but suspecting that its silence would permit a crime to go undetected, would be forced to choose

between breaching the contract and hoping an actual crime is eventually proven, or honoring the contract while a possible crime goes unnoticed.

*Id.* at 853–54.

As counsel for the petitioner conceded at oral argument, the dilemma described in this quotation from *Lachman* is precisely the dilemma that would result from the petitioner's construction of the settlement agreement.

State courts have similarly declined to enforce private agreements that barred the reporting or prosecution of possible crimes, even where the criminal prosecution would occur in a jurisdiction other than the jurisdiction of contract enforcement. In *Lewkowicz v. El Paso Apparel Corp.*, 625 S.W.2d 301 (Tex.1981), for example, an employer in the United States filed criminal charges against employees (who were United States citizens) in Mexico, resulting in the pre-trial incarceration of those employees in Mexico. The employees subsequently executed certain warranty deeds in exchange for the employer's dismissal of the charges. *Id.* at 302–03. The Texas Supreme Court declined to enforce the parties' agreement (notwithstanding its validity under Mexican law) because, in part, "[a] contract made in consideration of compounding a criminal offense is void because it is in contravention of ... public policy" in Texas. *Id.* at 304. *See also Baker v. Citizens Bank of Guntersville*, 282 Ala. 33, 208 So.2d 601, 606 (1968) ("[A] contract based upon a promise or agreement to conceal or keep secret a crime which has been com-

---

**8.** That statute provides that "[w]hoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under

this title or imprisoned not more than three years, or both." It has been construed to require "both knowledge of a crime and some affirmative act of concealment or participation." *Branzburg*, 408 U.S. at 696 n. 36, 92 S.Ct. 2646 (1972).

mitted is opposed to public policy and offensive to the law."); *Groening v. Nowlen,* 369 Mich. 28, 118 N.W.2d 998, 1000 (1963) ("[A] contractual obligation, or a conveyance, based on a promise, expressed or implied, to refrain from instituting or pressing a criminal charge or to obtain the suppression thereof, is opposed to public policy and is invalid on the ground of illegality of consideration."); *Berman v. Coakley,* 243 Mass. 348, 137 N.E. 667, 668 (1923) ("[A] private agreement made in consideration of the suppression of a criminal prosecution will neither be enforced nor abrogated by a court of equity. That doctrine is founded upon the public policy that the course of justice cannot be defeated for the benefit of an individual.").

Secondary authorities provide further support for the proposition that an agreement to not refer a matter to law enforcement authorities for investigation contravenes public policy. These authorities do not suggest that enforcement is to be denied only in those instances where the crime was committed in violation of the law of the jurisdiction of contract enforcement. The *Restatement (First) of Contracts,* for example, makes clear that "[a]

bargain in which either a promised performance or the consideration for a promise is concealing or compounding a crime or alleged crime is illegal." *Restatement (First) of Contracts* § 548(1) (1932). This rule applies "whether the crime in question is a felony or a misdemeanor, and whether the accused is innocent or guilty of the crime." *Id.* at § 548(1) cmt. a. Indeed, as Professor Corbin has noted:

> A bargain the purpose of which is the stifling of a prosecution is in all cases contrary to public policy and illegal even though it may not itself be a crime. This is true even though the prosecution in question is for a mere misdemeanor; and it is true whether the prosecution has or has not been started at the time the bargain is made. Bargains of this kind are in various forms, including promises not to prosecute or not to give evidence to the prosecuting officers ...

6A Arthur L. Corbin, *Corbin on Contracts* § 1421, at 355–56 (1962).[9]

 In short, it is a long-standing principle of general contract law that courts will not enforce contracts that purport to bar a party—here, the United

---

**9.** *See also* 14 Samuel Williston, *Williston on Contracts* § 1718, at 883–84 (3d ed. 1972) ("Any bargain, express or implied, having for its purpose or consideration the concealment or compounding of a crime is unlawful. The cases so holding are myriad, and have arisen in virtually every common-law jurisdiction. They are expressive of the public policy which governs the administration of justice."); 17A Am.Jur.2d *Contracts* § 273, at 276–77 (1991) ("All agreements tending to suppress legal investigations concerning offenses, or agreements stifling criminal prosecutions, are illegal."); 17A C.J.S. *Contracts* § 234, at 204 (1999) ("Agreements which tend to suppress legal investigation concerning criminal offenses ... are illegal as against public policy ...").

There appears to be a limited exception where prosecuting authorities contract not to prosecute. In *Newton v. Rumery,* 480 U.S.

386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), for example, the Supreme Court explicitly held that prosecutors may agree to dismiss pending criminal charges against a defendant, in exchange for that defendant's promise not to sue local governments and officials for constitutional violations arising out of the arrest and prosecution. That situation is not presented on this appeal, as the Army here was not the prosecuting authority. *Cf. Foreman v. Dep't of the Army,* 241 F.3d 1349, 1351 (Fed.Cir.2001) (affirming the Board's decision that a settlement agreement between the petitioner and the Army could not bind the Department of Defense, which is "a separate legal entity from the Army"). Moreover, the settlement agreement did not involve any agreement by Ms. Fomby–Denson to waive any right to sue the Army for any constitutional violations arising out the criminal referrals.

States Army—from reporting another party's alleged misconduct to law enforcement authorities for investigation and possible prosecution. We have no doubt that a contract provision requiring the United States to conceal possible crimes from state or foreign authorities would be contrary to public policy and unenforceable in most circumstances, whether or not the enforcement of that provision would violate a federal statute, treaty or constitutional requirement. The construction of the settlement agreement urged by petitioner must accordingly be rejected.

We wish to make clear, however, that there are limits on the rule we recognize and apply today. We do not decide whether this rule will apply if there is no allegation of a crime that would violate United States law if committed in the United States, or if the punishment imposed would not be of the same type as could be constitutionally imposed in the United States. Nor do we decide if this rule would apply if the alleged wrongdoer were not appropriately subject to the jurisdiction of the foreign sovereign. This case does not fall within the areas of any of these possible exceptions. Here forgery and use of forged documents for unauthorized residence are crimes under United States law, and the punishment of imprisonment would not be unconstitutional. Petitioner was also subject to the jurisdiction of the German authorities.

Moreover, while certain international agreements may obligate the United States to refer its citizens' alleged violations of a foreign government's criminal laws to that government, we are aware of no principle of contract law that requires the United States to make such referrals. The question presented is whether the United States can contractually bind itself to not refer such alleged misconduct and therefore place in the hands of the alleged

wrongdoer the ability to decide whether to make such referrals. We conclude that the United States may not do so.

Finally, we note that in referring Ms. Fomby–Denson to the German law enforcement authorities, it is of course appropriate for the Army to provide all details reasonably thought necessary for those authorities to make their decisions regarding the investigation and possible prosecution of Ms. Fomby–Denson. Absent a clear abuse, we will not second-guess the Army's decision as to the quantum of information provided to the German authorities regarding the forgery allegations and the existence of and terms of the settlement agreement. We find no such clear abuse here.

### CONCLUSION

The construction of the settlement agreement urged by petitioner would contravene public policy, and must accordingly be rejected. We therefore affirm the decision of the Merit Systems Protection Board.

*AFFIRMED.*

### COSTS

No costs.