KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Plaintiffs–Appellants,

v.

The UNITED STATES and the Timken Company, Defendants–Appellees.

No. 95–1497.

United States Court of Appeals, Federal Circuit.

Sept. 4, 1996.

Susan P. Strommer, Powell, Goldstein, Frazer & Murphy, Washington, DC, argued, for plaintiffs-appellants. With her on the brief were Peter O. Suchman and Christine Wood. Of counsel were Elizabeth C. Hafner and Niall P. Meagher.

Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for defendant-appellee The United States. With her on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel for Import Administration, Berniece A. Browne, Senior Counsel, and Joan L. Mac-Kenzie, Attorney–Advisor, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC.

James R. Cannon, Jr., Stewart & Stewart, Washington, DC, argued, for defendant-appellee The Timken Company. With him on the brief were Terence P. Stewart and William A. Fennell.

Before PLAGER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

Under 19 U.S.C. § 1673f(a) (1994), the amount of an antidumping duty is limited to the "amount of a cash deposit collected as security for an estimated antidumping duty." *Id.* The substantive question in this case is whether this cap on antidumping duties applies where no cash security deposit (or bond in lieu thereof) has been posted. The Court of International Trade held the cap inapplicable because the merchandise on which the antidumping duties were assessed was imported before the effective date of the statute creating the cap. We affirm, but on the ground that the statute is inapplicable because no cash deposit (or bond) as security for antidumping duties was made.

## I.

In response to a petition the appellee, The Timken Company (Timken), filed in 1973 with the Treasury Department (which then administered the antidumping laws), alleging that tapered roller bearings from Japan were being dumped (sold at less than fair value) in the United States, *Tapered Roller Bearings from Japan*, 38 Fed.Reg. 33,408 (1973), the Department on June 5, 1974 ordered that appraisal of the merchandise be withheld. *Tapered Roller Bearings from Japan*, 39 Fed.Reg. 19,969 (1974). This was the equivalent of suspension of liquidation (determination of duties). In September 1974, the Department determined that the appellants Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively, Koyo) and two other Japanese companies had sold tapered roller bearings in the United States at below fair value. *Tapered Roller Bearings from Japan*, 39 Fed.Reg. 32,337 (1974). On January 29, 1975, the International Trade Commission determined that such below-fair-value sales were likely to injure a United States industry—the second determination necessary to support an antidumping duty order. *Tapered Roller Bearings and Certain Components Thereof from Japan*, 40 Fed.Reg. 4366 (1975). In August 1976, Treasury issued a final dumping finding. *Tapered Roller Bearings and Certain Components Thereof from Japan*, 41 Fed.Reg. 34,974 (1976).

The present case involves antidumping duties on Koyo's tapered roller bearings entered between June 6, 1974 and January 29, 1975. At the time of entry, Koyo did not post a cash deposit or bond as security for

estimated antidumping duties. Koyo states that this was because "the Treasury Department preliminarily determined that the dumping margin on Koyo's entries of tapered roller bearings was zero or *de minimis,* [and] Koyo's bonding rate was set at zero percent."

Effective January 1, 1980, the administration of the antidumping laws was transferred from Treasury to the Department of Commerce. *See* Reorganization Plan No. 3 of 1979, 44 Fed.Reg. 69,273 (1979). In 1990, the International Trade Administration (Administration) of the Department of Commerce published the final results of its first administrative review of the 1976 antidumping order. *See Tapered Roller Bearings Four Inches or Less in Outside Diameter from Japan; Final Results of Antidumping Duty Administrative Review,* 55 Fed.Reg. 22,369 (1990). It found that Koyo and two other Japanese companies had dumped tapered roller bearings in the United States, and that Koyo's dumping margin, for which it assessed final duties, was 35.89 percent. *Id.* at 22,381.

Koyo and Timken filed suits in the Court of International Trade challenging the final results. Prior to the decision here under review, that court had remanded the case to Commerce four times for further proceedings. One of those remands was in the suit by Timken, which contended that Commerce had erred in not instructing the Customs Service not to impose the cap on the entries at issue here. *See Timken Co. v. United States,* 795 F.Supp. 438, 440, 446 (Ct. Int'l Trade 1992). According to Timken, the cap could not properly be applied to those entries.

The Court of International Trade agreed, and remanded the case "for [Commerce] to instruct the U.S. Customs Service not to apply the provisional duty assessment cap to entries made between June 5, 1974 and January 29, 1975." *Id.* at 448. The court relied on its prior decision in *Zenith Electronics Corp. v. United States,* 770 F.Supp. 648 (Ct. Int'l Trade 1991), which held that the cap applied only when the importer posted a cash deposit, as distinguished from a bond, as security for estimated antidumping duties. *See id.* at 651–54. Because Koyo had not

made a cash deposit for the entries, the cap would not apply under *Zenith.*

Koyo, which was a party to that case, did not appeal. Thereafter, in *Daewoo Electronics Co., Ltd. v. International Union of Electronic Workers,* 6 F.3d 1511 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994), this court upheld an Administration regulation that applied the cap to both cash deposits and bonds. *Id.* at 1521–23. *Daewoo Electronics Co., Ltd.* thus effectively overturned *Zenith,* upon which the Court of International Trade had relied in ordering Commerce to instruct Customs not to apply the cap to Koyo's entries.

In the present case, the Court of International Trade affirmed Commerce's redetermined final results but remanded the case to Commerce for the correction of "two computer programming errors." *Koyo Seiko Co., Ltd. v. United States,* 893 F.Supp. 52, 59 (Ct. Int'l Trade 1995). The court held that the cap was inapplicable to the entries here because it interpreted the 1979 statute that created the cap as not covering entries made before that statute's effective date of January 1, 1980. *Id.* at 58.

## II.

Timken has moved to dismiss Koyo's appeal for lack of jurisdiction. It contends that because the Court of International Trade remanded the case to the Administration for further action, the court's ruling was not a "final decision," which we have jurisdiction to review under 28 U.S.C. § 1295(a)(5) (1994). Timken relies on the statement in *Badger–Powhatan v. United States,* 808 F.2d 823, 5 Fed. Cir. (T) 72 (1986), that " 'an order remanding a matter to an administrative agency for further findings and proceedings is not final.' " *Badger–Powhatan,* 808 F.2d at 825, 5 Fed. Cir. (T) at 74 (citation omitted).

▪▪▪ "[A] judgment by a district court remanding a case to an administrative agency is nonfinal and hence nonappealable ... unless all that remains to be done on remand is a mechanical or otherwise 'ministerial' task, requiring no judgment or discretion." *Crowder v. Sullivan,* 897 F.2d 252, 252 (7th Cir.1990). In this case, the Court of Interna-

tional Trade's remand order required the Administration to perform only "a mechanical or other 'ministerial task'" that required no exercise of judgment or discretion. The remand that that court ordered did not make its judgment non-final for purposes of appeal.

The ordering portion of the Court of International Trade's judgment in this case provided:

> ORDERED that this case is remanded to Commerce to correct the two computer programming errors identified by The Timken Company; and it is further
>
> ORDERED that upon correction of the two programming errors, Commerce's Redetermination on Remand is affirmed in all respects; and it is further
>
> ORDERED that this case is dismissed.

*Koyo Seiko Co., Ltd.,* 893 F.Supp. at 59.

The court's order finally resolved all the issues the parties raised and affirmed the final results of the administrative review. The remand was solely to enable the Administration to correct two computer programming errors; the agency was not to perform any substantive functions or make any additional findings. Upon the correction of those two errors, the Administration's decision "is affirmed in all respects" and "the case is dismissed." Once the Administration performed the ministerial function of correcting the two errors, the case was over for both the Court of International Trade and the agency. The court understood and indicated that its judgment marked the end of the case before it, since it dismissed the case. The limited remand the Court of International Trade here ordered did not make its judgment non-final.

### III.

Timken further contends that the Court of International Trade's decision in the earlier case that the cap did not apply where a bond rather than a cash deposit had been posted as security for estimated antidumping duties is *res judicata* on the question whether the cap applies here; and that because Koyo, which was a party in that case, did not appeal from that ruling, the decision bars Koyo's present attempt to litigate the applicability of the cap to the entries at issue.

■ For a prior judgment to bind a party as *res judicata,* however, the judgment must have been a final one. *See, e.g., Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981); *Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). The prior judgment on which Timken relies was not final. It remanded the case, among other things, "for recalculation of the dumping margins," *Timken Co.,* 795 F.Supp. at 448, and was not a final judgment entitled to *res judicata* effect.

■ The principle determining the estoppel effect of that prior judgment, therefore, is not *res judicata* but the law of the case, under which a prior decision in the case is controlling in subsequent phases of the case. *See Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) ("[T]he [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") There are three well-established exceptions to the principle, one of which is where "controlling authority has since made a contrary decision of the law applicable to the issues." *Gould, Inc. v. United States,* 67 F.3d 925, 930 (Fed.Cir.1995).

■ This exception covers the present case. Our decision in *Daewoo Electronics Co., Ltd.,* which was rendered after the Court of International Trade's decision on which Timken relies, completely undermined that decision by holding that the cap applies to both cash deposits and bonds. The Court of International Trade in the present case correctly held that the law of the case did not preclude it from revisiting the cap issue.

### IV.

We come to the merits. The Court of International Trade construed the statute as covering only entries made after its effective date, and held that because Koyo's entries were made before that date, the cap does not cover them. The parties vigorously argue

before us whether the application of the cap is thus limited.

■ We find it unnecessary to decide that question. We conclude that the judgment of the Court of International Trade holding the cap inapplicable appropriately should be affirmed on a clearer and simpler alternative ground: that the cap does not apply unless a cash deposit has been collected or a bond posted as security for an estimated antidumping duty, neither of which occurred in this case.

A. The statute establishing the cap provides:

> § 1673f. Treatment of difference between deposit of estimated antidumping duty and final assessed duty under antidumping duty order
>
> (a) Deposit of estimated antidumping duty under section 1673b(d)(1)(B) of this title
>
> If the amount of a cash deposit collected as security for an estimated antidumping duty under section 1673b(d)(1)(B) of this title is different from the amount of the antidumping duty determined under an antidumping duty order published under section 1673e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission under section 1673d(b) of this title is published shall be—
>
> > (1) disregarded, to the extent the cash deposit collected is lower than the duty under the order, or
> >
> > (2) refunded, to the extent the cash deposit is higher than the duty under the order.

19 U.S.C. § 1673f.

In other words, the cap on the assessment of antidumping duties is the amount of cash deposited (or bond posted) as security for an estimated antidumping duty. (For convenience, we use the words "cash deposit" to include a bond, see *Daewoo Electronics Co., Ltd.*, 6 F.3d 1511.) If the final antidumping duty exceeds the cash deposit, the excess is disregarded; if it is less than the security deposit, the excess is refunded.

If no cash security deposit has been collected, as was the case here, the statutory cap simply does not apply. Indeed, since it is the cash deposit that determines the amount of the cap, without such cash deposit by definition there cannot be any cap. Moreover, without a cash deposit, there can be no "security for an estimated antidumping duty," 19 U.S.C. 1673f(a), which is an essential element of the cap.

Koyo argues that the reason it did not make a cash deposit as security for estimated antidumping duties was because Treasury set a "zero bonding rate" as its estimate of the antidumping duty on Koyo's merchandise. Even if this were this case—which is far from clear from the documentation Koyo offers, see *Koyo Seiko Co., Ltd.*, 893 F.Supp. at 58–59—it would be irrelevant. Under the statute the critical question is whether a cash deposit was collected. If no security deposit was made, the reason for not making it is immaterial. Congress conditioned the cap on antidumping duties on the making of a cash deposit. In so doing, it protected importers who had posted such security against the unfairness of being required to pay additional duties on the dumped merchandise, perhaps years after the importation.

Congress could have framed the cap in terms of the anticipated amount of antidumping duties without regard to any deposit. Instead, it provided a cap conditioned and based upon the amount of the "cash deposit collected as security for an estimated antidumping duty." To accept Koyo's argument would require us to ignore the clear and unambiguous language of the statute. The argument also would enable Koyo to escape payment of the antidumping duties that finally have been assessed against it. This would contravene "[t]he purpose of the antidumping statute[, which] is to protect domestic manufacturing against foreign manufacturers who sell at less than fair market value." *Koyo Seiko Co., Ltd. v. United States*, 20 F.3d 1156, 1159 (Fed.Cir.1994).

B. The legislative history of the cap provision supports our conclusion that it is inapplicable where no cash deposit has been made (or bond posted) as security for estimated antidumping duties. The cap was sec-

tion 737 of the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144. The Senate report on the bill stated:

Under section 737 of the Tariff Act of 1930, as added by section 101 of the bill, the difference between the security posted under section 733(d)(2) on an entry during an investigation and the antidumping duty imposed under section 731(a) would be (1) disregarded if the security is less, or (2) refunded, if the security is more. . . .

After an antidumping duty order is issued under section 736, the difference between estimated duty deposits required under section 736(a)(3) and antidumping duties imposed under section 731(a) would be collected or refunded, as the case may be.

S.Rep. No. 249, 96th Cong., 1st Sess. 77 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 463.

The report explained that the "[r]eason for the provision" was that "Article 11(1) of the [General] Agreement [on Tariffs and Trade,]" (GATT), *id.,*

prohibits collection of the difference between any security posted during the investigation and the final antidumping duty if the latter exceeds the former. Section 737(a) implements this provision for the United States.

*Id.* Article 11(1)(i) of the GATT stated:

If the anti-dumping duty fixed in the final decision is higher than the provisionally paid duty, the difference shall not be collected. If the duty fixed in the final decision is lower than the provisionally paid duty or the amount estimated for the purpose of the security, the difference shall be reimbursed or the duty recalculated, as the case may be.

Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, Part I, art. 11, 31 U.S.T. at 4934.

The House Report similarly stated:

Section 737 changes present law to conform it to the international agreement by requiring that the difference between a cash deposit collected as security on an entry of merchandise subject to a notice of suspension of liquidation under 733(d) and

the amount of the duty finally assessed must be disregarded if the deposit is less, and refunded if the deposit is greater, than the amount finally assessed.

H.R.Rep. No. 317, 96th Cong., 1st Sess. 70 (1979).

Thus, both committee reports and the GATT, which the cap was intended to implement, all indicated that the cap covers the situation where the amount of a cash deposit made as security for estimated antidumping duties differs from the duties finally assessed, and provides that any deficiency in the amount deposited was to be disregarded and any excess refunded. These explanations show that a cash deposit as security for estimated antidumping duties was an essential element of the cap in section 737.

## V.

The remaining question is whether our affirmance of the judgment of the Court of International Trade on a ground other than that the court or the agency gave is consistent with the Supreme Court's decision in *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("*Chenery*"). We conclude that it is.

■ In *Chenery,* the Court referred to "the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct 'although the lower court relied upon a wrong ground or gave a wrong reason.' The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate." 318 U.S. at 88, 63 S.Ct. at 459 (citation omitted). It held, however, that in judicial review of agency decisions a different rule applies: "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Id.* at 87, 63 S.Ct. at 459.

To determine the applicability of this broad principle to the unusual circumstances of the present case, it is necessary briefly to describe the factual situation in *Chenery* in

which the issue arose. *Chenery* involved the reorganization of a holding company under the Public Utility Holding Company Act of 1935, 15 U.S.C. §§ 79–79Z–6 (1994). During the reorganization, members of the company's management had purchased on the open market shares of the company's preferred stock. The Securities and Exchange Commission (Commission) held that that stock could participate in the reorganized company only to the extent of the amount the management members had paid for it, which was less than the amount the other preferred stockholders would receive. *Chenery*, 318 U.S. at 83–85, 63 S.Ct. at 456–58.

The sole basis the Commission stated for its ruling was that in so trading the management breached its fiduciary obligations to its stockholders, and it applied what it called "'the broad equitable principles enunciated in the cases heretofore cited.'" *Id.* at 87, 63 S.Ct. at 459. The Supreme Court rejected the Commission's order because those established equitable principles did not support it. *Id.* at 87–91, 63 S.Ct. at 459–61.

The Court also rejected the alternative ground on which the Commission sought to sustain its order: that a reorganization plan under which the management shares would be treated as favorably as the publicly-held shares would not satisfy the Holding Company Act's standards that a reorganization plan must be "'fair and equitable'" and cannot be "'detrimental to the public interest'" or "'the interest of investors and consumers.'" *Id.* at 90, 63 S.Ct. at 460. It explained:

> [T]he considerations urged here in support of the Commission's order were not those upon which its action was based. The Commission did not rely upon 'its special administrative competence'; it formulated no judgment upon the requirements of the 'public interest or the interest of investors or consumers' in the situation before it. Through its preoccupation with the special problems of utility reorganizations the Commission accumulates an experience and insight denied to others. Had the Commission, acting upon its experience and peculiar competence, promulgated a general rule of which its order here was a particular application, the problem for our

consideration would be very different. Whether and to what extent directors or officers should be prohibited from buying or selling stock of the corporation during its reorganization, presents problems of policy for the judgment of Congress or of the body to which it has delegated power to deal with the matter.

*Id.* at 92, 63 S.Ct. at 461.

The Court directed that the case be remanded to the Commission "for such further proceedings, not inconsistent with this opinion, as may be appropriate." *Id.* at 95, 63 S.Ct. at 462.

On remand, the Commission reached the same result, but placed its decision on the ground that a reorganization plan that gave the management stock the same treatment as the publicly-held stock would contravene the standards of the Holding Company Act. *SEC v. Chenery Corp.*, 332 U.S. 194, 199, 67 S.Ct. 1575, 1578, 91 L.Ed. 1995 (1947). The Supreme Court upheld the Commission. *Id.* at 209, 67 S.Ct. at 1583. It stated that "the Commission has made a thorough examination of the problem, utilizing statutory standards and its own accumulated experience with reorganization matters. In essence, it has made what we indicated in our prior opinion would be an informed, expert judgment on the problem." *Id.* at 207, 67 S.Ct. at 1582. The Court said that in its prior decision,

> we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Id.* at 196, 67 S.Ct. at 1577.

In *Chenery*, the Commission's determination whether the reorganization plan met the

standards of the Holding Company Act involved and required the exercise of the broad discretion Congress had given the agency in applying those indeterminate standards. It was "a determination or judgment which an administrative agency alone is authorized to make," *id.* at 88, 63 S.Ct. at 459, one reflecting "'its special administrative competence.'" *Chenery,* 318 U.S. at 92, 63 S.Ct. at 461.

In the present case, in contrast, the sole issue is one of statutory construction: whether the cap applies where there has been no cash deposit made (or bond posted) as security for an estimated antidumping duty. That is not "a determination or judgment which an administrative agency alone is authorized to make." *Chenery,* 332 U.S. at 196, 67 S.Ct. at 1577. As we have concluded, the plain language of the statute compels the conclusion that the cap does not cover that situation. Unlike the situation in *Chenery,* the answer to that question does not require or implicate the exercise of agency discretion in applying subtle and complex statutory standards to particular facts. Under our interpretation of the statutory cap provision, if the Administration had held the cap applicable here, we would have had no choice but to reverse that ruling.

Our conclusion that *Chenery* does not preclude affirmance of the Court of International Trade on the alternative ground we adopt is supported by the Supreme Court's statement in *ICC v. Brotherhood of Locomotive Engineers,* 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), that *Chenery* held that a court "may not affirm on a basis containing any element of discretion—including discretion to find facts and interpret statutory ambiguities—that is not the basis the agency used, since that would remove the discretionary judgment from the agency to the court." *Id.* at 283, 107 S.Ct. at 2368.

Indeed, in directing Customs not to apply the cap, Commerce merely carried out the Court of International Trade's directive remanding the case to the agency to take that action. Commerce stated: "[I]n accordance with the Court's order, Commerce will instruct Customs to liquidate entries made between June 6, 1974, the date Treasury pub-

lished an affirmative determination of sales at less than fair value, and January 29, 1975, the date of the International Trade Commission's final affirmative injury determination, and collect final assessments of antidumping duties without regard to the provisional duty assessment cap in section 737 of the Tariff Act." U.S. Dep't of Commerce, Results of Redetermination Pursuant to Court Remand (Oct.1992). Commerce expressed no views on, and did not evaluate, the court's ruling that the cap applies only to cash deposits and not to bonds posted in lieu thereof. *See id.*

Decisions of other courts of appeals further support our conclusion here. *See Arkansas AFL–CIO v. FCC,* 11 F.3d 1430, 1439 (8th Cir.1993) ("[T]he Supreme Court clearly limited *Chenery* to situations in which the agency failed to make a necessary determination of fact or of policy."); *NLRB v. American Geri–Care, Inc.,* 697 F.2d 56, 64 (2d Cir.1982) ("[T]he *Chenery* doctrine, as Professor Davis has rightly said, has been 'softened in its application.' It does not mean that a reversal and remand are required each and every time an administrative agency assigns a wrong reason for its action; rather, it requires reversal and remand only where there is a significant chance that but for the error, the agency might have reached a different result.") (citation omitted), *cert. denied,* 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983); *Lee v. Kennedy,* 294 F.2d 231, 234 (D.C.Cir.) ("[T]he Court's statement, '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based', is to be understood with a qualification; the order must be judged upon the grounds upon which action was based, unless the appellate court concludes that the decision 'already made ... should properly be based on another ground within the power of the appellate court to formulate.'"), *cert. denied,* 368 U.S. 926, 82 S.Ct. 362, 7 L.Ed.2d 190 (1961); *see also* Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 Duke L.J. 199, 210 & n.41 ("[W]hen agency action is statutorily compelled, it does not matter that the agency which reached the decision required by law did so on a debata-

ble or even a wrong ground, for remand in such a case would be but a useless formality.").

We have applied *Chenery* in reviewing Court of International Trade decisions affirming Administration decisions. *See NEC Home Elecs., Ltd. v. United States,* 54 F.3d 736, 742 (Fed.Cir.1995); *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398, 401 n. 8 (Fed.Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994); *Timken Co. v. United States,* 894 F.2d 385, 389, 8 Fed. Cir. (T) 36, 39–40 (1990). In the particular circumstances of this case, however, *Chenery* does not preclude us from affirming the judgment of the Court of International Trade on the ground, which neither the court nor the agency gave, that the statutory cap does not apply to the entries here involved because Koyo did not make a cash deposit (or post a bond) as security for estimated antidumping duties.

## CONCLUSION

The judgment of the Court of International Trade is

AFFIRMED.