Slip Op. 01-101

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| | : | |
| TA CHEN STAINLESS STEEL PIPE, Ltd., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 99-07-00446 |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

[ITA antidumping duty determination remanded.]

Dated:  August 14, 2001

Ablondi, Foster, Sobin & Davidow, P.C. (Joel Davidow, Peter Koenig, and Kristen Smith) for plaintiff.

Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mark L. Josephs), Cindy G. Buys, Office of the General Counsel, United States Department of Commerce, of counsel, for defendant.

## OPINION

**RESTANI, Judge:**  This matter is before the court on a motion for judgment upon the agency record pursuant to USCIT Rule 56.2.  Ta Chen Stainless Steel Pipe, Inc. ("Ta Chen" or "plaintiff") challenges certain aspects of an antidumping duty determination by the Department of Commerce ("Commerce" or "the Department").  See Certain Welded Stainless Steel Pipe from Taiwan, 64 Fed. Reg. 33,243 (Dep't Comm. 1999) (final admin. revs.) [hereinafter "Final Results"].  In particular, Ta Chen challenges, under the antidumping statute existing before the

Uruguay Round Agreements Act ("URAA"), the following: (1) Commerce's finding of related parties as contrary to the statute or, alternatively, as unsupported by substantial evidence, and (2) the agency's use of "best information available" ("BIA") in the calculation of Ta Chen's dumping margin.

## FACTS

On December 30, 1992, Commerce concluded that certain welded stainless steel pipe from Taiwan was being sold in the United States at less than fair value and published the order imposing antidumping duties on those imports. Certain Welded Stainless Steel Pipe from Taiwan, 57 Fed. Reg. 62,300 (Dep't Comm. 1992) (amd'd final determ. and order). In December of 1993 and 1994, pursuant to 19 C.F.R. § 353.22(a) (1993), Ta Chen requested an administrative review covering the periods June 1992 through November 1993 (first review) and December 1993 through November 1994 (second review), respectively. Request for Admin. Rev. (Dec. 16, 1993), P.R. Doc. 1-2; Request for Admin. Rev. (Dec. 12, 1994), P.R. Doc. 2-2.[1]

Commerce issued its original questionnaire in the first review to Ta Chen on March 16, 1994, requesting data on Ta Chen's U.S. sales to related companies to be provided separately from sales to unrelated companies. First Review Original Quest., at 32, P.R. Doc. 1-8, DOC App., Tab 3, at 4. The Department included the statutory standard for relatedness, 19 U.S.C. § 1677(13) (1988), and stated that companies would generally be considered related based on stock ownership or common board membership. Id. at 32 & App. 2, DOC App., Tab 3, at 4-5. In the

---

[1] Citations to the record are as follows: "P.R. Doc. 1-__" and "C.R. Doc. 1-__" refer to documents in the first review public and confidential records, respectively. Likewise, "P.R. Doc. 2-__" and "C.R. Doc. 2-__" refer to documents in the second review public and confidential records, respectively.

narrative section of its questionnaire response, Ta Chen responded that "all products sold in the U.S. are to unrelated customers." First Review Quest. Resp. (May 18, 1994), at 20, C. R. Doc. 1-1. Ta Chen also submitted as an exhibit a list of its U.S. customers, which included Sun Stainless Steel, Inc. ("Sun") but did not identify San Shing Hardware Works, USA ("San Shing"). Id. at 117, DOC App., Tab 1, at 3. Finally, Ta Chen noted that its wholly-owned subsidiary in the United States, Ta Chen International ("TCI"), facilitated the importation and sales of Ta Chen's products. Id. at 2-5.

In July 1994, petitioners for the first time raised allegations that Ta Chen was related to certain U.S. customers, including Sun, and that San Shing's d/b/a as Sun also raised concerns of relatedness. Letter re: Unreported Sales (July 18, 1994), C.R. Doc. 1-5, DOC App., Tab 2, at 1. One year later petitioners alleged a continuing failure on the part of Ta Chen to report completely and accurately its sales to related parties, and urged the Department accordingly to reject Ta Chen's sales data. See Letter re: False Reporting of Unrelated Sales (July 12, 1995), C.R. Doc. 1-18, DOC App., Tab 5. Throughout its submissions during the first review, Ta Chen sought to substantiate its assertions that the company was not related either to San Shing or Sun. See, e.g., Reply to Allegations of Unreported Sales (July 28, 1994), C.R. Doc. 1-9, Pl.'s App., Tab B; Comments re: Reporting of Unrelated Sales (Aug. 2, 1995), C.R. Doc. 1-19, Pl.'s App., Tab K; Case Brief (Sept. 3, 1997), Pl.'s App., Tab R.

For the second review, in the original questionnaire, Commerce requested Ta Chen to provide data on the company's first U.S. sales to unrelated customers, based on the statutory criteria for relatedness found in 19 U.S.C. § 1677(13), including control through common board membership or stock ownership. See Second Review Original Quest. (Mar. 2, 1995), at 7, 32,

App. 2, P.R. Doc. 2-7.  Ta Chen included in its May 1, 1995 questionnaire response sales made

to Sun.  See Second Review Quest. Resp. (May 1, 1995), at Exh. 32, Pl.'s App., Tab D, at Exh.

32.  Ta Chen repeated from its first review response that "all pipe sold in the U.S. are to

unrelated customers."  Id. at 25, Pl.'s App., Tab D, at 6.  Again, Ta Chen identified TCI as a

wholly-owned U.S. subsidiary that facilitated sales between Ta Chen and U.S. purchasers.  Id. at

3.  In July of 1995, petitioners reasserted their claims of relatedness among Ta Chen, San Shing,

and Sun.  Letter re: Unrelated Party Sales (July 12, 1995), C.R. Doc. 2-1.  As in the first review,

Ta Chen consistently maintained in each of its second review submissions that San Shing and

Sun were not related to Ta Chen.  See, e.g., Reply to Allegations of Unrelated Party Sales (Aug.

2, 1995), C.R. Doc. 2-3; Supp. Quest. Resp. (Dec. 31, 1996), at 37-39, Exh. 19, Pl.'s App., Tab

L, at 2-4, Exh. 19; Case Brief, Pl.'s App., Tab R.

         In February of 1996, at Ta Chen's request, the Department commenced the third

administrative review, covering the period December 1994 through November 1995.[2]  Certain

Welded Stainless Steel Pipe From Taiwan, 62 Fed. Reg. 1435, 1435 (Dep't Comm. 1997)

(prelim. admin. rev.).  In one of the supplemental questionnaires for that review, after having

become more familiar with the issues from the ongoing two reviews, Commerce specifically

requested Ta Chen to detail its relationship with Sun and a company that Ta Chen identified as

San Shing.  See Third Review Supp. Quest. Resp. (Nov. 12, 1996), at 34 (Field 14.0), C.R. Doc.

1-22, DOC App., Tab 7, at 4.  Ta Chen's supplemental questionnaire response, which was

---

[2]        The third administrative review, evaluated under the URAA, concluded in 1997
and has been reviewed by the court in Ta Chen Stainless Steel Pipe, Ltd. v. United States, No.
97-08-01344, 1999 WL 10001194 (Ct. Int'l Trade Oct. 28, 1999), and Ta Chen Stainless Steel
Pipe, Ltd. v. United States, No. 97-08-01344, 2000 WL 1225799 (Ct. Int'l Trade Aug. 25, 2000).

included in the record for the first two reviews in December 1996 at Commerce's request,

detailed various connections between Ta Chen, San Shing and Sun, none of which suggested an

ownership interest by Ta Chen in the others. See P.R. Doc. 1-69; P.R. Doc. 2-17; Final Results,

64 Fed. Reg. at 33,244. Commerce asked further detailed questions regarding the extent of Ta

Chen's relationship with San Shing and Sun in the third review second supplemental

questionnaire, the response to which Ta Chen placed on the record of these reviews in January of

1997. See Filing of Third Review Submission (Jan. 31, 1997), at 3-6, C.R. Docs. 1-23, 2-6, Pl.'s

App., Tab M, at 3-6.

Commerce issued the preliminary results in the first and second reviews simultaneously

in May 1997. Certain Welded Stainless Steel Pipe from Taiwan, 62 Fed. Reg. 26,776 (Dep't

Comm. 1997) [hereinafter "Preliminary Results"]. The Department preliminarily determined

that the use of BIA was appropriate because Ta Chen had not disclosed its relationships with

certain U.S. customers and had failed to report properly U.S. sales to related parties. Id. at

26,777. In the Final Results, also issued jointly for both reviews, Commerce confirmed its

finding that Ta Chen was related to San Shing and Sun under 19 U.S.C. § 1677(13). 64 Fed.

Reg. at 33,244-59. In particular, the Department identified the following factors in support of its

conclusion:

- San Shing and Sun were both established by current or former managers and officers of Ta Chen

- San Shing and Sun were staffed entirely by current or former Ta Chen employees, including sales and clerical personnel

- San Shing and Sun distributed only Ta Chen products in the United States

- Ta Chen had control of San Shing's and Sun's bank accounts, with authority to sign checks issued by them

- Ta Chen had physical custody of San Shing's and Sun's check-signing stamps

- San Shing and Sun had pledged their assets to secure a bank loan for Ta Chen International, a wholly-owned U.S. subsidiary of Ta Chen

- Ta Chen had full-time and unfettered access to San Shing's and Sun's computerized accounting records

- Ta Chen's president owned the property housing San Shing and Sun

- Ta Chen's president negotiated the prices at which Ta Chen products would subsequently be sold by San Shing and Sun

Id. at 33,256. Ta Chen's failure to identify the companies as related and accurately report the requested data on a related-party basis rendered a significant portion of the sales data unreliable. Id. at 33,264-65. Accordingly, the Department concluded that Ta Chen had effectively impeded the progress of the reviews and failed to act to the best of its ability, thereby warranting the use of total adverse BIA in the calculation of Ta Chen's dumping margins. Id. at 33,267.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those agency determinations which are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

Under the pre-URAA statute, dumping margins are calculated as "an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise" subject to investigation or review.  19 U.S.C. § 1673 (1988).  Because U.S. price is based on the transaction between a respondent and a U.S. purchaser, 19 U.S.C. § 1677a, respondents may be able to manipulate the U.S. price to be calculated by the Department and thereby lower their dumping margins by selling a subject product to a related U.S. company at a price above what would be charged to an unrelated end-user.  Cf. Aimcor, Ala. Silicon, Inc. v. United States, 18 CIT 1106, 1109-10, 871 F. Supp. 455, 458-59 (1994) (recognizing risks of price distortions in transactions between related parties).  In recognition of this possibility, the statute permits the Department, under certain conditions, to consider the respondent and its related U.S. company collectively as the "exporter" when determining the price at which the subject merchandise is sold by the exporter to a U.S. purchaser:

> For the purpose of determining United States price, the term "exporter" includes the person *by whom or for whose account the merchandise is imported* into the United States if –
>
> > (A)  such person is the agent or principal of the exporter, manufacturer, or producer;
> >
> > (B)  such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;
> >
> > (C)  the exporter, manufacturer, or producer owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in any business conducted by such person; or
> >
> > (D)  any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in

> the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer.

19 U.S.C. § 1677(13) (emphasis added).

A. Importers and Non-Importers as Related Parties

Plaintiff's initial statutory argument challenges the Department's authority to examine the relationship of Ta Chen to San Shing and Sun under the terms of the pre-URAA relatedness provision. Section 1677(13) permits a related party to be considered an "exporter" collectively with a respondent only if the related party meets the threshold requirement that it is the "party by whom or for whose account the merchandise is imported." 19 U.S.C. § 1677(13). For those shipments where San Shing and Sun are not importers of the subject merchandise, i.e., the pipe is not imported by either company or for their accounts,[3] Ta Chen argues that Commerce may not determine that the two companies are related to Ta Chen, and therefore, may not use the two companies' prices as exporters' prices. Therefore, under Ta Chen's reasoning, the pre-URAA statute precludes a related party inquiry as between an exporter and a non-importer, notwithstanding any possible "control" Ta Chen may have over San Shing and Sun, as identified in subsections (A) through (D) of section 1677(13).

---

[3]    Ta Chen indicates that TCI "was almost always indicated as the U.S. importer" in its questionnaire response, and that this argument only applies where that is the case. Pl.'s Br. at 10. It appears from the record that although TCI is most often the importer of record, Sun is occasionally identified as the customer and the importer. See, e.g., Second Review Supp. Quest. Response (Dec. 31, 1996), at 307 (lines 1450, 1900, 2050), Pl.'s App., Tab L, at 307; First Review Quest. Resp. (Section C-1 Computer Printout) (May 18, 1994), at lines 514-18, C.R. Doc. 1-1. Obviously, in those instances, Ta Chen's "importer" argument is inapplicable.

In its final determination, Commerce failed to respond to this argument. The Department addresses solely plaintiff's arguments relating to the consideration of non-equity factors in evaluating relatedness between respondents and U.S. importers and purchasers (discussed infra). Compare Final Results, 64 Fed. Reg. at 33,244-45 (Ta Chen's argument regarding applicability of related party provision to non-importers) with id. at 33,250-52 (Commerce's response to arguments raised by interested parties). Although Commerce attempts to address plaintiff's argument in its brief on appeal, the agency's "post hoc rationalizations" cannot support its determination.[4] Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). "The

_____

[4]    In any event, the Department's argument in its brief is circular and uninformative. The essence of the agency's response is as follows: "Because Commerce found Ta Chen to be related to San Shing and Sun . . . these entities are also considered the importer within the meaning of section 1677(13) of the Act." DOC Br. at 16. Ta Chen's argument, however, is that because only an importer may be considered related under 19 U.S.C. § 1677(13), the Department must first determine whether San Shing and Sun are importers before concluding that they are related. To suggest, as the Department does, that the status of San Shing and Sun as importers follows from their relatedness to Ta Chen does not answer whether and how San Shing and Sun qualify as "person[s] by whom or for whose account the merchandise is imported into the United States . . . ." 19 U.S.C. § 1677(13).

        Following its inverted reasoning, Commerce further fails to address sufficiently an agency determination cited by plaintiff that is directly on point. In Certain Small Business Telephone Systems and Subassemblies Thereof from Korea, 54 Fed. Reg. 53,141 (Dep't Comm. 1989) (final determ.), the Department appears to have employed the approach now proposed by Ta Chen. In that case GST (the respondent), "partially owned" by Siemens AG, owned a "small interest" in EIS (the U.S. importer). EIS had made sales during the POI to SIS, a wholly owned subsidiary of Siemens AG. Petitioner had argued that sales between EIS and SIS should be excluded from the margin calculations because they were related parties. In rejecting petitioner's argument, Commerce noted that a person may be an "exporter" under 19 U.S.C. § 1677(13) "if, inter alia, that person is someone by whom or for whose account the merchandise is imported into the United States." 54 Fed. Reg. at 53,151. Because "SIS [was] neither the importer nor the person for whose account the merchandise [was] imported," the Department concluded that EIS and SIS could not be related parties, and that the sales from EIS to SIS should therefore be included in margin calculations. Id. When addressing this issue on remand, Commerce must explain what new facts and/or legal interpretations in the present determination warrant a different conclusion from that drawn in Small Business Telephones. See Hussey Copper, Ltd. v. United States, 17 CIT 993, 997, 834 F. Supp. 413, 418 (1993) (quoting Citrosuco Paulista, S.A.

grounds upon which an administrative order must be judged are those upon which the record

discloses that its action was based." SEC v. Chenery Corp., 318 U.S. 80, 87 (1943). Therefore,

on remand, Commerce first must clarify whether San Shing and Sun qualify as importers. If

they are deemed non-importers, Commerce must then consider the extent to which non-importers

may qualify as persons "for whose account the merchandise is imported into the United States,"

and whether San Shing and Sun do in fact constitute such persons. [5]

B. Interest

    1. Financial and Non-financial Criteria

Plaintiff's second statutory argument challenges Commerce's finding of relatedness on

the ground that the Department, contrary to the "any interest" language of the pre-URAA

relatedness provision, 19 U.S.C. § 1677(13), failed to identify an equity interest on the part of Ta

Chen in either San Shing or Sun. The court has rejected two previous attempts to place such a

---

v. United States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988)) ("It is 'a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure . . . .'").

[5] The court recognizes that "the Chenery doctrine is not applied inflexibly." Fleshman v. West, 138 F.3d 1429, 1433 (Fed. Cir. 1998) (citing, inter alia, Koyo Seiko Co. v. United States, 95 F.3d 1094, 1099-1102 (Fed. Cir. 1996)). Nevertheless, remand is necessary in this case to allow the agency to make the policy judgments inherent in construing and applying an ambiguous statutory provision. Cf. Koyo Seiko, 95 F.3d at 1101 (refusing to remand where plain language of statute "compel[led]" conclusion and therefore did not require exercise of agency discretion); Heveafil Sdn. Bhd. v. United States, No. 97-04-00659, 1999 WL 507621, at *4 (Ct. Int'l Trade July 14, 1999) (plain language of statute renders remand unnecessary). Such expertise and policymaking is particularly relevant here, where the agency must interpret the phrase "for whose account the merchandise is imported" in light of the need to base U.S. price on sales to unrelated purchasers and calculate dumping margins "as accurately as possible." NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (quoting Rhone-Poulenc v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).

restrictive reading on section 1677(13).  In E.I. DuPont de Nemours & Co. v. United States, 17

CIT 1266, 1278-80, 841 F. Supp. 1237, 1247-48 (1993), and Sugiyama Chain Co. v. United

States, 18 CIT 423, 432-33, 852 F. Supp. 1103, 1112 (1994), Commerce had determined

respondents to be related to U.S. companies under 19 U.S.C. § 1677(13) based on, inter alia, one

company's provision of the other's start-up capital, common directors, and common

management.  See DuPont, 841 F. Supp. at 1247; Sugiyama, 852 F. Supp. at 1112.  In Sugiyama,

the Department had not even identified equity ownership as a relevant criterion in its relatedness

determination.[6]  852 F. Supp. at 1112 (citing Roller Chain, Other than Bicycle, From Japan, 57

Fed. Reg. 43,697, 43,701 (Dep't Comm. 1992) (final admin. rev.)).  On appeal, the interested

parties in each case claimed that Commerce had impermissibly examined non-financial criteria in

support of its relatedness findings.  See DuPont, 841 F. Supp. at 1248; Sugiyama, 852 F. Supp. at

1112.  In both instances the court upheld the factors considered by the Department as consistent

with the guidelines of 19 U.S.C. § 1677(13).  See DuPont, 841 F. Supp. at 1248; Sugiyama, 852

F. Supp. at 1112.  Having previously held that Commerce is permitted under the pre-URAA

statute to consider factors beyond those that establish a simple financial interest, the court rejects

Ta Chen's invitation to revisit the issue by imposing an unduly restrictive definition upon the

term "interest" in 19 U.S.C. § 1677(13).

_____

[6]     The Department only identified the existence of two common directors and Sugiyama's provision of 60% of the other company's start-up capital as bases for its finding of relatedness.  Roller Chain, 57 Fed. Reg. at 43,701.  Plaintiff incorrectly characterizes this second factor as a 60% ownership interest by Sugiyama in the other company.  Pl.'s Br. at 20 n.16.  Providing 60% of a company's start-up capital does not necessarily correlate to a 60% equity ownership interest.  Furthermore, the fact that the Department expressly relied on the start-up capital instead of any equity ownership that may have been exchanged therefor, indicates that the agency's basis was the actual provision of the start-up funds rather than equity ownership, as plaintiff suggests.

   2. Past Practice

Although the statute authorizes the Department to examine factors other than equity

ownership when evaluating the relatedness of companies, Commerce's exclusive reliance on

factors beyond ownership to support its related party finding in this case cannot be sustained

because it is inconsistent with Department's pre-URAA practice.  The court highlighted this

inconsistency in Queen's Flowers de Colombia v. United States, 21 CIT 968, 975-78, 981 F.

Supp. 617, 624-27 (1997), in which Commerce tried to substantiate its finding of relatedness by

reference to such non-financial factors.  The court found the agency's reference to factors other

than ownership interests to contradict directly two earlier Commerce determinations.  First, the

court noted that in Fresh Cut Roses from Ecuador, 60 Fed. Reg. 7019, 7040 (Dep't Comm. 1995)

(final determ.), Commerce had specifically rejected "[p]etitioner's arguments concerning

interlocking shareholders, shifting of production, possibility of price manipulation, and control of

production and sales," because such factors were considered in the collapsing analysis only after

a related party finding had already been made.  Queen's Flowers, 981 F. Supp. at 625 (quoting

Fresh Cut Roses, 60 Fed. Reg. at 7040).  Also cited by the Queen's Flowers court as evidence of

Department practice was Disposable Pocket Lighters from Thailand, 60 Fed. Reg. 14,263 (Dep't

Comm. 1995) (final determ.), in which the Department reasoned as follows:

> We note that the Department only collapses sales under section 773(13) of the
> statute if the parties are related.  Since Thai Merry has no ownership interest in
> TMHK, the Department [finds the companies not to be related and therefore] has
> not considered TMHK's sales to the United States for purposes of calculating the
> margin.

Id. at 14,268.[7]  The court therefore remanded the case to allow Commerce an opportunity to

provide a reasoned explanation for the apparent change in agency practice.  Queen's Flowers,

981 F. Supp. at 626-27.

The Department notably fails to respond in its brief to plaintiff's challenge based on

Queen's Flowers, discussing neither the applicability of Queen's Flowers nor any subsequent

agency determinations that would suggest a deliberative reconsideration of the role of non-

ownership factors under the pre-URAA relatedness provision.[8]  Commerce seeks to rely on

Sugiyama, 852 F. Supp. 1103, and DuPont, 841 F. Supp. 1237, and the agency determinations

underlying those cases as upheld by the court, to establish its practice of considering non-

ownership factors.  As observed by the court in Queen's Flowers, however, such reliance is

misplaced because those cases predate the determinations in Fresh Cut Roses and Disposable

Pocket Lighters, and therefore, cannot support a claim of a current practice of basing a related

party finding on non-ownership factors pursuant to the pre-URAA statute.[9]  See Queen's

---

[7]        Commerce acknowledges that it "refused to consider control factors" in
Disposable Pocket Lighters, but argues that other cases that it cites are more indicative of
Commerce's practice.  DOC Br. at 23 n.17.  As discussed infra, those other cases do not relieve
Commerce of the burden of explaining its change in policy between Disposable Pocket Lighters
and the present determination.

[8]        Although the court ordered a remand in Queen's Flowers for Commerce to
explain its possibly new practice of considering non-financial factors in making related party
findings, the Department never formulated such an explanation because the case was dismissed
before issuance of the Remand Redetermination.  See Queen's Flowers de Colombia v. United
States, No. 96-08-01921 (Ct. Int'l Trade May 28, 1999) (order dismissing case because of
settlement agreement).

[9]        The one contemporaneous case cited by the Department as support for its
consideration of non-equity factors is Oil Country Tubular Goods, 60 Fed. Reg. 33,539, 33,544
(Dep't Comm. 1995) (final determ.), cited in Final Results, 64 Fed. Reg. at 33,251.  Commerce
appears to have considered factors beyond ownership when evaluating the possible relatedness of

Flowers, 981 F. Supp. at 626.  For the same reason, the agency's citations to Certain Residential

Door Locks, 54 Fed. Reg. 53,153 (Dep't Comm. 1989) (final determ.) and Portable Electric

Typewriters from Japan, 48 Fed. Reg. 7768, 7770 (Dep't Comm. 1983) (final admin. rev.) are

unavailing.[10]  Commerce must therefore explain why it now believes, contrary to its conclusions

in Fresh Cut Roses and Disposable Pocket Lighters, that it should examine the relevance of non-

equity factors in its relatedness determinations governed by the pre-URAA statute.[11]

---

the companies at issue in OCTG and found such factors insufficient for a related party finding,
although its conclusion rested, at least in part, on the observation that "there is no proof of any
stock ownership between the companies."  Id.  See also id. ("Finally, we also note that the
petitioners have shown, and we have found, no ownership between the parties.").  Whatever
support this decision may provide to confirm Commerce's arguably more recent practice of
evaluating non-ownership factors, even in the absence of equity ownership, the agency may not
rely on this sole determination to refute the clear contrary conclusions in the determinations cited
in the text.  Where an agency determination deviates from practice without acknowledgement of
and a reasoned explanation for the change in policy, such determination may not serve as the
justification for subsequent departures from that past practice.  See TransCanada Pipelines, Ltd.
v. FERC, 24 F.3d 305, 309 (D.C. Cir. 1994) (citing Professional Airways Sys. v. FLRA, 809
F.2d 855, 860 (D.C. Cir. 1987)); Hatch v. FERC, 654 F.2d 825, 834 (D.C. Cir. 1981).  At best,
Commerce's rationale in OCTG, without explicitly stating a change in policy, merely reveals the
agency to have been acting inconsistently well before the Department articulated its rationale in
the determination under review.

[10]        Prior determinations in the same time period as Residential Door Locks and
Portable Electric Typewriters also suggest that Commerce's purportedly pre-existing practice of
basing related party findings, in part, on non-ownership criteria was not as consistent as the
agency claims.  See, e.g., Certain Forged Steel Crankshafts from Japan, 52 Fed. Reg. 36,984,
36,985 (Dep't Comm. 1987) (final determ.) (rejecting petitioner's claims of relatedness because
"Department policy has been not to consider parties to be related within the meaning of
771(13)(C) of the Act if the ownership interest of one party in the other is less than five
percent"); Portland Hydraulic Cement from Japan, 48 Fed. Reg. 41,059, 41,061 (Dep't Comm.
1983) (final determ.) ("Where one party retains less than a 5 percent interest in another party, the
practice of the Department has been not to consider those parties as related within the meaning of
section 771(13) of the Act.").

[11]        In contrast to the pre-URAA related party provision, the URAA expressly
contemplates consideration of non-ownership factors in the identification of "affiliated persons."
See 19 U.S.C. § 1677(33) (1994).  The Statement of Administrative Action further clarifies that

Furthermore, agency practice reveals that, whatever may have been the conflicting agency

positions with regard to the use of non-ownership factors to support related party findings where

equity ownership did exist, the Department has never permitted such "control factors" on

their own to establish relatedness under pre-URAA law.[12]  The Department has taken the position

in the past, at the agency level and before this court, that it is not required to consider factors

other than ownership when evaluating relatedness.  In Television Receiving Sets, Monochrome

and Color, from Japan, 46 Fed. Reg. 30,163, 30,164 (Dep't Comm. 1981) (final admin. rev.),

Commerce found companies not be related because "there [was] no known equity interest" of

---

determining relatedness under the URAA by focusing exclusively on stock ownership is too
simplistic:

> "[C]ontrol" exists if one person is legally or operationally in a position to exercise
> restraint or direction over another person.  The Administration believes that
> including control in the definition of "affiliated" will permit a more sophisticated
> analysis which better reflects the realities of the marketplace.

> The traditional focus on control through stock ownership fails to address
> adequately modern business arrangements, which often find one firm
> "operationally in a position to exercise restraint or direction" over another even in
> the absence of an equity relationship.  A company may be in a position to exercise
> restraint or direction, for example, through corporate or family groupings,
> franchises or joint venture agreements, debt financing, or close supplier
> relationships in which the supplier or buyer becomes reliant upon the other.

H.R. Rep. 103-826(I), at 838, reprinted in, 1994 U.S.C.C.A.N. 4040, 4174-75.  Notwithstanding
this congressional sanction for considering non-ownership factors under the new statute, and the
agency's recent reasonable interpretations of the "affiliated persons" provision, see Mitsubishi
Heavy Indus., Ltd. v. United States, 54 F. Supp. 2d 1183, 1190-91 (Ct. Int'l Trade 1999); Ferro
Union, Inc. v. United States, 44 F. Supp. 2d 1310, 1322-27 (Ct. Int'l Trade 1999), Commerce has
not yet explained why such a practice is appropriate under the former statute.

[12]       As the agency acknowledges, "it is true that Commerce had not previously based a
related party finding exclusively upon the grounds of [non-ownership based] control . . . ."  DOC
Br. at 24 (emphasis in original).

one company in the others.  On appeal, petitioners argued that notwithstanding the absence of equity ownership, the companies were related based on the Japanese keiretsu system, which produced effects akin to those of equity-based relationships.  See Zenith Radio Corp. v. United States, 9 CIT 110, 113, 606 F. Supp. 695, 699 (1985), aff'd, 783 F.2d 184 (Fed. Cir. 1986).  The court upheld the Department's refusal to consider factors other than equity ownership when making a related party finding, finding that such consideration was "not required of the ITA by law."  Id., 9 CIT at 114, 606 F. Supp. at 700.  In subsequent determinations, Commerce rejected parties' attempts to establish relatedness in the absence of ownership, relying on Zenith as support for its refusal to consider non-ownership factors such as the keiretsu system (again), Television Receiving Sets, Monochrome and Color, from Japan, 50 Fed. Reg. 24,278, 24,280 (Dep't Comm. 1985) (final admin. rev.), and "financial inter-dependencies, inter-locking and coordinated directors and officers, and de facto operation."  Cellular Mobile Telephones and Subassemblies from Japan, 54 Fed. Reg. 48,011, 48,016 (Dep't Comm. 1989) (final admin. rev.).

This refusal on the part of the Department had an ineluctable policy corollary, namely, that non-ownership factors on their own could not establish relatedness.  If such factors could have sustained a related party finding in the absence of equity ownership, then the agency's reasoned response to parties arguing for relatedness (as in the above determinations) could not have logically rested with the observation that ownership did not exist between the relevant companies, because the lack of equity ownership would not have been dispositive.  Rather, the agency would have been required to evaluate parties' arguments regarding non-ownership criteria before determining that relatedness had not been established.  By not undertaking such an evaluation and instead responding definitively to parties' relatedness arguments simply with

evidence of no ownership, Commerce effectuated a policy of finding no relatedness unless evidence revealed concurrent equity ownership. On remand, therefore, Commerce must also identify the reasons for now considering non-equity factors to serve in certain cases as the exclusive factors supporting a related party finding under pre-URAA law.

In an attempt to salvage its determination before the court, the Department suggests that the court uphold the related party finding, notwithstanding the change in agency practice, based on the agency's explanation in the Final Results as to why such a finding is reasonable in this case. DOC Br. at 27 n.21. The purpose of requiring agencies to articulate clearly departures from past practice and to provide reasoned explanations for such departures is "'to prevent the agency itself from significantly changing [its] policies without conscious awareness of, and consideration of the need for, change . . . . If an administrative agency decides to depart significantly from its own precedent, it must confront the issue squarely and explain why the departure is reasonable." Davila-Bardales v. INS, 27 F.3d 1, 5 (1st Cir. 1994) (citations omitted). Acknowledgment by the agency that it is changing its practice is thus an integral component of any acceptable explanation justifying the new policy in order to ensure that the agency's "standards are being deliberately changed, not casually ignored . . . ." Greater Boston Televesion Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970), cert. denied, 403 U.S. 923 (1971). Otherwise, "[w]ithout any explicit recognition by the [Department] that the standard has been changed, or any attempt to forthrightly distinguish or outrightly reject apparently inconsistent precedent, we are left with no guideposts for determining the consistency of administrative action in similar cases, or for accurately predicting future action by the [Department]." Hatch, 654 F.2d at 834-35 (footnote omitted). In light of these principles, the court declines Commerce's

suggestion to recognize the rationale provided in the Final Results as a sufficient explanation for

the Department's change in practice where such rationale, rather than acknowledging the policy

change, attempts to argue that it is consistent with past practice. This type of explanation does

not qualify as "a reasoned analysis for the change" in policy. Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983).


**CONCLUSION**

The court remands the determination because of Commerce's inadequate reasoning in

concluding that Ta Chen and San Shing and Sun are related parties. On remand Commerce shall

(1) respond to Ta Chen's argument by clarifying the extent to which San Shing and Sun, if they

are non-importers, qualify as parties "by whom or for whose account the merchandise is imported

into the United States"; (2) discuss the reasons for changing its pre-URAA practice in

considering non-equity factors in its related party analysis, and in particular, explain the rationale

behind the new policy of determining that parties may be related based exclusively on non-equity

factors, in the absence of ownership between the relevant companies; and (3) determine, based

on the preceding remand analyses, whether San Shing and Sun are related parties to Ta Chen

pursuant to 19 U.S.C. § 1677(13) (1988). Because the Department's imposition of BIA was

based on its related party finding, see Final Results, 64 Fed. Reg. at 33,264-65, and the

Department will effectively undertake a new related party analysis upon remand, the court does

not address now plaintiff's arguments challenging the substantial evidence underlying the

agency's related party conclusion and the agency's consequent resort to BIA. Those arguments

may be incorporated or re-submitted, if necessary, in the parties' comments on the Department's

remand results.

_____

Jane A. Restani

JUDGE

Dated:  New York, New York

      This 14th day of August, 2001.