**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Rossi*, **Slip Opinion No. 2025-Ohio-5398.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-5398

DISCIPLINARY COUNSEL *v.* ROSSI.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Rossi*, Slip Opinion No. 2025-Ohio-5398.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including making false statement in a pleading and attempting to thwart prosecution of a criminal case—Six-month suspension.*

(No. 2024-1722—Submitted May 14, 2025—Decided December 5, 2025.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-010.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, DEWINE, CARR, DETERS, HAWKINS, and SHANAHAN, JJ. DONNA J. CARR, J., of the Ninth District Court of Appeals, sat for BRUNNER, J.

**Per Curiam.**

{¶ 1} Respondent, Gregg August Rossi, of Youngstown, Ohio, Attorney Registration No. 0051224, was admitted to the practice of law in Ohio in 1990.

{¶ 2} In a March 2024 complaint, relator, disciplinary counsel, charged Rossi with professional misconduct related to his representation of a single client in an assault case wherein the victim was the client's romantic partner. Specifically, the complaint alleged that Rossi made a false statement to a tribunal and engaged in conduct prejudicial to the administration of justice arising from his drafting a nondisclosure agreement between the client and the victim that interfered with the prosecution of his client's criminal case.

{¶ 3} The parties entered into stipulations of fact and submitted 14 stipulated exhibits. During a hearing before a three-member panel of the Board of Professional Conduct, relator presented testimony from Rossi and three other witnesses. Rossi testified on his own behalf and submitted 36 additional exhibits.

{¶ 4} After the hearing, the panel issued a report in which it made findings of fact and determined by clear and convincing evidence that Rossi had committed the charged misconduct. The panel recommended that Rossi be suspended from the practice of law for six months and that his reinstatement to the profession be conditioned on his completion of six hours of continuing legal education ("CLE") focused on ethics, professionalism, and the application of Marsy's Law in addition to the hours required by Gov.Bar R. X. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction.

{¶ 5} Rossi objects to the board's report and recommendation, arguing that the facts of this case do not warrant an actual suspension from the practice of law and that a public reprimand or a conditionally stayed suspension would adequately protect the public from further misconduct.

{¶ 6} After independently reviewing the record and our precedent, we overrule Rossi's objection, adopt the board's findings of misconduct and

recommended sanction, and suspend Rossi from the practice of law for six months with his reinstatement to the profession dependent on his compliance with the board's recommended condition.

## I. FACTS AND MISCONDUCT

{¶ 7} By the time of Rossi's disciplinary hearing, he and Dr. John Yerkey had known each other for more than 20 years. Their relationship was initially professional—Yerkey, a chiropractor, referred clients to Rossi, who handled their personal-injury cases. Yerkey eventually became a client of Rossi. At some point, their business relationship developed into a social relationship.

{¶ 8} When Yerkey lost his home to foreclosure, Rossi purchased a home, placing both their names on the deed. Yerkey lived in the home, using his skills to renovate it, and Rossi paid him for the renovations. Unable to buy Rossi out, Yerkey eventually transferred his interest in the property to Rossi. But he continued to lease the property and live there through 2021 and 2022.

{¶ 9} In May 2021, Yerkey began a romantic relationship with T.D., a pharmacist. That December, Yerkey was arrested and charged with the misdemeanor assault of T.D. Rossi represented Yerkey in that matter.

{¶ 10} Yerkey was released on bond during the pendency of the case. One condition of his bond was that he have no contact with T.D. Notwithstanding the existence of the no-contact order, T.D. sent Yerkey a text message on Christmas Eve 2021 inviting Yerkey to talk. Thereafter, Yerkey communicated with T.D. in an attempt to influence the prosecution of his assault case, and T.D. attempted to have the no-contact order lifted.

{¶ 11} Although Rossi reminded Yerkey of the no-contact order on at least four occasions, Rossi also suggested that potential benefits might accrue from Yerkey's continuing communication with T.D. For example, Rossi sent Yerkey a text message stating, "I cannot recommend you violate a court order. If you do[,] that is at your own risk. Obviously if you are on good terms that will help you in

the long run but your call." In another text message, he asked Yerkey for information about T.D. that Yerkey could obtain only by violating the no-contact order.

{¶ 12} Yerkey also enlisted Rossi's assistance to prevent the prosecution of the assault charges against him. He requested that Rossi draft a nondisclosure agreement to cover May 1, 2021, to February 10, 2022, which spanned the date of the assault until right before a scheduled pretrial on the assault case, and asked that it directly refer to the criminal case. While the criminal case remained pending, Rossi drafted a document entitled "MUTUAL RELEASE, SETTLEMENT AGREEMENT, AND NON-DISCLOSURE AGREEMENT" ("the nondisclosure agreement" or "the agreement") without ever speaking with T.D.

{¶ 13} As drafted by Rossi, the nondisclosure agreement contained a dismissal clause stating, "[T.D.] shall request that the charges in Case No. 2021 CRB 00385 in Mahoning County Area Court No. 5 be dismissed without prejudice." It also included a confidentiality clause in which the parties mutually agreed as follows:

> [N]either shall publish, disseminate, circulate, share, or otherwise disclose in any manner any personal information between the parties, including but not limited to texts, e-mails, phone calls, posts, pictures, or any other means or form of communication, digital or otherwise, between the parties or from or to either party or about either party that were generated between May 1, 2021, and the execution of this document.

The agreement further provided that any breach of its terms would result in a monetary penalty of $1,000 per disclosure.

{¶ 14} In response to relator's letter of inquiry, Rossi wrote, "Nothing in the Agreement was designed to force a dismissal." But in his disciplinary-hearing testimony, Rossi acknowledged that the agreement imposed a mandatory duty on T.D. to request that the criminal case against Yerkey be dismissed and that she was "contractually obligated" to do so.

{¶ 15} During Rossi's disciplinary hearing, T.D. testified that Yerkey initiated the conversation about the nondisclosure agreement. She believed that the agreement would protect them both but stated that she felt pressured to sign it because Yerkey had implied that he would contact and share pictures with her employer if she did not cooperate. She understood his comments to be a threat to her job and her occupation.

{¶ 16} At Yerkey's instruction, on February 10, 2022, T.D. went to Rossi's office and signed the nondisclosure agreement in his presence. T.D. testified that Rossi did not speak with her about the agreement before this appointment and that he did not recommend that she obtain her own counsel. Rossi confirmed that he did not speak with T.D. until she appeared at his office to sign the nondisclosure agreement. A week after T.D. signed the agreement, Rossi informed Yerkey that he needed to sign it "before Tuesday," the day of the scheduled pretrial hearing in his assault case. In his disciplinary-hearing testimony, Rossi explained that because the nondisclosure agreement included a mutual release, it would not be binding until both T.D. and Yerkey had signed it. Therefore, T.D. would not be contractually obligated to request dismissal of the criminal case until Yerkey had also signed the agreement.

{¶ 17} T.D. had initially cooperated in the prosecution of Yerkey's assault case. But after signing the nondisclosure agreement, she believed that the penalty clause would apply if she continued to speak with prosecutors about the assault. She therefore informed the prosecutor's victim/witness coordinator that she could

no longer talk about the case. The prosecutor's office believed that it no longer had the testimony of T.D.—a necessary witness—to prove its case.

{¶ 18} During Rossi's disciplinary hearing, Mahoning County Assistant Prosecuting Attorney Patrick Fening testified that after learning of the nondisclosure agreement, he filed a motion to compel its disclosure. Rossi filed written objections to that motion, in which he lied to the court, stating, "The terms and conditions of this Agreement were negotiated between [T.D.] and undersigned counsel and entered into, providing mutual release and a non-disclosure agreement with respect to the alleged incident." In fact, Yerkey asked Rossi to draft the nondisclosure agreement, and Rossi admitted in his disciplinary-hearing testimony that he did not speak to T.D. until she arrived at his office to sign it.

{¶ 19} Rossi testified that his statement to the court about negotiating the nondisclosure agreement with T.D. was a "mistake." The panel, however, did not find Rossi's claim of "mistake" to be credible. Instead, the panel found that Rossi falsely claimed that he had negotiated the terms of the nondisclosure agreement with T.D. so that the court would not learn that Yerkey was violating the no-contact condition of his bond and potentially violating Marsy's Law, Ohio Const., art. I, § 10(A) (guaranteeing certain rights to victims of criminal offenses). The board agreed with the panel and found that Rossi had intentionally lied to the court.

{¶ 20} The testimony of Fening and Judge Molly Johnson, both of whom were originally assigned to Yerkey's criminal case, supports the board's determination. Fening testified that had he known that Yerkey was in contact with T.D., he would have at least brought the issue to the court's attention and perhaps moved the court to revoke Yerkey's bond. Moreover, Judge Johnson testified that her practice is to schedule a bond-revocation hearing when a defendant has violated a no-contact order with a bond condition. The judge further testified that if she had been informed about the communications between Yerkey and T.D. in this case, she "absolutely" would have considered a revocation hearing.

{¶ 21} Judge Johnson ultimately conducted an in camera review of the nondisclosure agreement. After reviewing its contents, she recused herself from Yerkey's case and filed a grievance with relator against Rossi. The chief justice appointed a retired judge to preside over Yerkey's case.

{¶ 22} At Judge Johnson's suggestion, T.D. spoke with an attorney about the nondisclosure agreement and eventually resumed her cooperation with the prosecutor's office. Yerkey waived his right to a jury trial, and his case was tried to the bench. The court found Yerkey guilty of assault and subsequently sentenced him to the maximum sentence of 180 days' incarceration, with credit for time served. *State v. Yerkey*, Mahoning C.C. 5 No. 2021 CRB 00385, (Apr. 11, 2024).

{¶ 23} The board found that clear and convincing evidence demonstrated Rossi's violation of Prof.Cond.R. 3.3(a)(1) (prohibiting a lawyer from knowingly making a false statement of fact or law to a tribunal) when he wrote that he had negotiated the nondisclosure agreement with T.D.

{¶ 24} In addition, the board found by clear and convincing evidence that Rossi violated Prof.Cond.R. 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice) by (1) implicitly encouraging Yerkey to violate the court's bond condition of no contact with T.D., (2) drafting the nondisclosure agreement in part to influence the prosecution of Yerkey's criminal case, (3) failing to explain the nondisclosure agreement to T.D. or to suggest that she obtain counsel before signing the agreement, and (4) delaying the criminal proceedings and necessitating the appointment of a new judge in Yerkey's criminal case. We adopt the board's findings that Rossi's conduct violated Prof.Cond.R. 3.3(a)(1) and 8.4(d).

## II. RECOMMENDED SANCTION

{¶ 25} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the

aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 26} The board found three aggravating factors and three mitigating factors in this case. The aggravating factors consist of Rossi's dishonest or selfish motive, his multiple rule violations, and his refusal to acknowledge the wrongful nature of his misconduct. *See* Gov.Bar R. V(13)(B)(2), (4), and (7). The board expressly declined to find that "the vulnerability of and resulting harm" to the victim, Gov.Bar R. V(13)(B)(8), was an aggravating factor.

{¶ 27} As for mitigating factors, the board found that Rossi did not have a history of prior discipline, exhibited a cooperative attitude toward the disciplinary proceeding, and submitted evidence of his good character and reputation. *See* Gov.Bar R. V(13)(C)(1), (4), and (5).

{¶ 28} The board recommended that we suspend Rossi from the practice of law for six months and that his reinstatement to the profession be conditioned on proof of his completion of six hours of CLE focused on ethics, professionalism, and the application of Marsy's Law in addition to the hours required by Gov.Bar R. X. In support of that sanction, the board relied on three cases imposing six-month suspensions for comparable misconduct. *See Disciplinary Counsel v. Spinazze*, 2020-Ohio-957 (a part-time city prosecutor made false representations to a court about his reasons for offering a plea agreement and then made additional misrepresentations to his supervisor to conceal his misconduct); *Disciplinary Counsel v. Rohrer*, 2009-Ohio-5930 (an attorney deliberately violated a juvenile judge's order barring communications with the media and then made false statements to the judge denying his conduct); *Lake Cty. Bar Assn. v. Speros*, 1995-Ohio-205 (an attorney filed an affidavit in court bearing the forged signature of a notary and containing a false statement claiming that his failure to timely file an appellate brief was the result of a clerical error).

### III. ROSSI'S OBJECTION TO THE RECOMMENDED SANCTION

{¶ 29} Rossi raises a single objection to the board's report, arguing that the facts of this case, including what he characterizes as "substantial" and "impressive" mitigating evidence, do not warrant an actual suspension from the practice of law and that a public reprimand or a conditionally stayed suspension would be sufficient to protect the public.

### IV. ANALYSIS

#### A. Rossi does not appreciate the full extent of his misconduct

{¶ 30} Rossi has not objected to the board's findings of misconduct. In his objections, he acknowledges that he made a single false statement in a pleading that he filed in court in violation of Prof.Cond.R. 3.3(a)(1). However, Rossi maintains—as he did in the proceedings below—that the nondisclosure agreement he drafted was legal, valid, and enforceable. He suggests that the board found that his conduct in drafting the agreement was prejudicial to the administration of justice in large part because it delayed Yerkey's criminal proceedings.

{¶ 31} But the delay occasioned by the prosecutor's motion to compel disclosure of the nondisclosure agreement was just one of several reasons why the board found that Rossi had engaged in conduct that was prejudicial to the administration of justice in violation of Prof.Cond.R. 8.4(d). The board also found that Rossi violated that rule by implicitly encouraging Yerkey to violate the court's bond condition of no contact with T.D., by drafting the nondisclosure agreement to influence the prosecution of Yerkey's criminal case, and by failing to explain the nondisclosure agreement to T.D. or to suggest that she obtain counsel before signing the agreement.

#### B. Rossi's conduct was prejudicial to the administration of justice

{¶ 32} After reviewing the record, we find by clear and convincing evidence that Rossi engaged in conduct that was prejudicial to the administration of justice in violation of Prof.Cond.R. 8.4(d) in three respects.

*1. Rossi implicitly encouraged Yerkey to violate the no-contact order*

{¶ 33} First, Rossi engaged in conduct that was prejudicial to the administration of justice by implicitly encouraging Yerkey to violate the county court's no-contact order. We acknowledge that on several occasions, Rossi reminded Yerkey by text message not to contact T.D. Indeed, in a separate text message, he told Yerkey, "I cannot recommend you violate a court order" and added, "If you do[,] that is at your own risk."

{¶ 34} But in that same text message, Rossi suggested that remaining in contact with T.D. benefitted Yerkey, stating, "Obviously if you are on good terms that will help you in the long run." Then, instead of reiterating his previous advice that Yerkey not contact T.D., Rossi closed the text message: "[B]ut your call," leaving to Yerkey's discretion whether to comply with the court's no-contact order. A few days later, Rossi sent Yerkey a text message asking, "What's up with [T.D]?" Yerkey's subsequent text messages to Rossi, arranging a time for T.D. to sign the nondisclosure agreement at Rossi's office, leave no doubt that Yerkey continued speaking with T.D. in violation of the no-contact order and that Rossi encouraged that conduct.

*2. Rossi made a false statement in a pleading filed in the county court*

{¶ 35} Second, Rossi engaged in conduct prejudicial to the administration of justice by making the false statement to the county court about the origin of the nondisclosure agreement. Rossi falsely claimed that *he* had negotiated the terms of the nondisclosure agreement with T.D. even though he knew that (1) he had had no direct contact with T.D., (2) Yerkey was the one who had negotiated with T.D., and (3) Yerkey's communication with T.D. was in direct violation of that court's no-contact order.

{¶ 36} Rossi's communications with Yerkey were subject to attorney-client privilege, and under Prof.Cond.R. 1.6, Rossi could not reveal that Yerkey had violated the county court's no-contact order without Yerkey's informed consent

unless that information fell within an exception to the privilege. However, nearly 20 years ago, we agreed with the Supreme Court of Nebraska, which counseled:

"An attorney owes his first duty to the court. He assumed his obligations toward it before he ever had a client. His oath requires him to be absolutely honest even though his clients' interests may seem to require a contrary course. The [lawyer] cannot serve two masters; and the one [he has] undertaken to serve primarily is the court."

(Brackets added in *Nienaber*.) *Cincinnati Bar Assn. v. Nienaber*, 1997-Ohio-314, ¶ 13, quoting *In re Integration of Nebraska State Bar Assn.*, 133 Neb. 283, 289 (1937).

{¶ 37} The comments to Prof.Cond.R. 3.3 further advise:

Performance of [the attorney's duties as an advocate], while maintaining confidences of the client . . . is qualified by the advocate's duty of candor to the tribunal. Consequently, although a lawyer in an adversary proceeding is not required to present an impartial exposition of the law or to vouch for the evidence submitted in a cause, the lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false.

Prof.Cond.R. 3.3, Comment 2.

{¶ 38} Despite his duty of honesty and candor to the court, Rossi chose to lie to the court about the origin of the nondisclosure agreement, claiming that he negotiated the agreement with T.D. when he should have remained silent on the issue. That false statement was not intended to preserve Yerkey's confidential information. Rather, it was intended to conceal Yerkey's violation of the court's

no-contact order by deflecting any suspicion that Yerkey had violated that order, thereby avoiding bond-revocation proceedings against Yerkey. Rossi's conduct was prejudicial to the administration of justice.

3. *Rossi drafted a nondisclosure agreement intended to thwart the prosecution of criminal charges pending against his client*

{¶ 39} Third, Rossi engaged in conduct that was prejudicial to the administration of justice by drafting a nondisclosure agreement that attempted to silence T.D. and thwart the prosecution of the criminal charges against Yerkey.

{¶ 40} Rossi has insisted throughout this disciplinary process that the nondisclosure agreement was designed to protect the professional relationships of Yerkey and T.D. by "keep[ing] them from spreading unflattering information, including photographs, each about the other." He contends that the agreement "did not call for [T.D.] to refuse to cooperate with the prosecution," but merely called for her to "request" that the prosecutor dismiss Yerkey's criminal case.

{¶ 41} Rossi insists that if the prosecutor refused to dismiss the case, "[T.D.] was not contractually bound to refuse to speak to the prosecutor, to ignore a subpoena or to ignore a court directive to answer questions." But as we read the agreement, T.D. would have been contractually obligated to maintain the confidentiality of her interactions with Yerkey even if she were to respond to a subpoena or appear as a witness at trial.

{¶ 42} As drafted by Rossi, the agreement identifies the parties to the agreement and states that they had been involved in a personal relationship since May 2021. The agreement places Yerkey's criminal case front and center, stating, "[T.D.] filed a police report arising out of an interaction between the parties on December 18, 2021 in N. Lima, Ohio, and [Yerkey] has been charged in Mahoning County Court No. 5 with Assault."

{¶ 43} The agreement later requires T.D. to "request that the charges in Case No. 2021 CRB 00385 in Mahoning County Area Court No. 5 be dismissed

without prejudice." Then, following a mutual release of any claims resulting from or connected with their personal relationship, the agreement broadly prohibits Yerkey and T.D. from disclosing "any personal information between the parties, including but not limited to texts, e-mails, phone calls, posts, pictures, or any other means or form of communication, digital or otherwise" that were generated between May 1, 2021, and the execution of the agreement—a period that includes the incident underlying the criminal case against Yerkey. The agreement then establishes a monetary penalty of $1,000 for each disclosure of protected information.

{¶ 44} Rossi correctly asserts that the agreement required T.D. to speak with the prosecutor to seek dismissal of the criminal charges against Yerkey. But he also contends that the nondisclosure agreement did not prevent T.D. from cooperating with the prosecution of the criminal case. We disagree.

{¶ 45} Paragraph four of the nondisclosure agreement prohibits the parties from disclosing the terms of the nondisclosure agreement or the negotiations leading up to the agreement, "except to the extent required by law." But that exception applies only to the prohibitions set forth in that paragraph. The nondisclosure agreement does not contain a comparable exception that would permit T.D. to disclose "to the extent required by law" any of the communications between herself and Yerkey related to the criminal charge against Yerkey. And to the extent that the nondisclosure agreement prohibits T.D. from disclosing the communications between herself and Yerkey related to the conduct underlying Yerkey's criminal case, it is unenforceable.

{¶ 46} "Liberty of contract is not an absolute and unlimited right, but upon the contrary is always subservient to the public welfare." *Pittsburgh, C., C. & St. L. Ry. Co. v. Kinney*, 95 Ohio St. 64, at syllabus (1916). For more than 200 years, this court has recognized that "the right of making contracts at pleasure is a personal privilege of great value, and ought not to be slightly restrained; but it must be

restrained when contracts are attempted against the public law, general policy, or public justice." *Key v. Vattier*, 1 Ohio 132, 147 (1823). The test for determining whether a contract provision is void as against public policy is "'whether its purpose is "injurious to the public or contravenes some established interest of society."'" *Rhoades v. Equitable Life Assur. Soc. of U.S.*, 54 Ohio St.2d 45, 47 (1978), quoting *L'Orange v. Med. Protective Co.*, 394 F.2d 57 (6th Cir. 1968), quoting *McCullough Transfer Co. v. Virginia Sur. Co., Inc.*, 213 F.2d 440, 443 (6th Cir. 1954).

{¶ 47} We have held, "A release, executed between parties, the consideration of which, in whole or in part, is the suppression of criminal prosecution, is void because of a lack of consideration." *Brown v. Best Prods., Inc.*, 18 Ohio St.3d 32 (1985), syllabus, applying *Springfield Fire & Marine Ins. Co. v. Hull*, 51 Ohio St. 270 (1894), paragraph one of the syllabus ("A contract, the consideration of which, in whole or in part, is the suppression of a criminal prosecution, is without any legal efficacy, either as a cause of action or as a defense to an action not founded on or arising out of the agreement."). In the cited cases, however, the defendants had used the threat of bogus criminal charges to coerce the plaintiffs into agreeing not to pursue legitimate civil remedies. *Brown* at 34-35; *Springfield Fire* at 277-278.

{¶ 48} But a contractual provision that frustrates the prosecution of a criminal case is void against public policy even absent such coercion. In *Fomby-Denson v. Dept. of Army*, 247 F.3d 1366 (Fed.Cir. 2001), the United States Court of Appeals for the Federal Circuit considered whether public policy prohibited the enforcement of a contract between the United States Army and an enlistee in which the army agreed not to refer fraud allegations against the enlistee to civilian law enforcement. *Id.* at 1369, 1373.

{¶ 49} Relying on decisions of the United States Supreme Court, the Tenth Circuit Court of Appeals, and several state supreme courts, the Federal Circuit

determined, "[I]t is a long-standing principle of general contract law that courts will not enforce contracts that purport to bar a party . . . from reporting another party's alleged misconduct to law enforcement authorities for investigation and possible prosecution." *Id*. at 1377-1378; *see, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 696 (1972) ("[I]t is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy"); *Lachman v. Sperry-Sun Well Surveying Co.*, 457 F.2d 850, 853 (10th Cir. 1972) ("It is public policy in Oklahoma and everywhere to encourage the disclosure of criminal activity. . . ."); *Baker v. Citizens Bank of Guntersville*, 282 Ala. 33, 39 (1968) ("[A] contract based upon a promise or agreement to conceal or keep secret a crime which has been committed is opposed to public policy and offensive to the law."); *Groening v. Nowlen*, 369 Mich. 28, 33 (1963) ("[A] contractual obligation, or a conveyance, based on a promise, expressed or implied, to refrain from instituting or pressing a criminal charge or to obtain the suppression thereof, is opposed to public policy and is invalid on the ground of illegality of consideration.").

{¶ 50} Applying these principles to a settlement agreement with a nondisclosure clause similar in scope and purpose to the nondisclosure agreement at issue here, the United States District Court for the Eastern District of Pennsylvania held, "[T]o the extent a [confidential settlement agreement] purports to prevent its signatories from voluntarily disclosing information about crimes to law enforcement authorities, it is unenforceable as against public policy." *Cosby v. Am. Media, Inc.*, 197 F.Supp.3d 735, 742 (E.D.Penn. 2016).

{¶ 51} Despite Rossi's repeated denials, one of the clear purposes of the nondisclosure agreement he drafted was to prohibit T.D.'s cooperation with law-enforcement authorities and subvert the truth-seeking function of the trial process. We therefore conclude that Rossi's drafting of the nondisclosure agreement to specifically identify the criminal case against Yerkey and prohibit T.D. from

disclosing in any manner any communication that occurred between the parties during the period in which the alleged criminal offense occurred was unethical and prejudicial to the administration of justice to the extent that it purported to prevent T.D. from disclosing information about Yerkey's alleged crimes to law-enforcement authorities.

**C. An actual suspension is an appropriate sanction for Rossi's misconduct**

*1. This is not a false-notary case*

{¶ 52} In his objection, Rossi contends that the facts of this case do not support the board's recommendation that he be suspended from the practice of law for six months. Arguing that he has not engaged in a pattern of misconduct and that he has presented substantial mitigating evidence, he contends that the appropriate sanction for his misconduct is either public reprimand or a conditionally stayed suspension.

{¶ 53} In support of his argument that a public reprimand is the appropriate sanction for his misconduct, Rossi relies primarily on ten cases imposing that sanction on attorneys whose misconduct arose entirely from the false notarization of documents and the filing of those documents with a court. In four of those cases, the attorney signed a client's name to a document with authorization, notarized that signature without indicating that fact on the face of the document, and then filed the document with a court. *See Disciplinary Counsel v. Moore*, 2017-Ohio-883; *Disciplinary Counsel v. Wilson*, 2014-Ohio-5487; *Disciplinary Counsel v. Mezacapa*, 2004-Ohio-302; *Cincinnati Bar Assn. v. Thomas*, 2001-Ohio-1344.

{¶ 54} In three other cases that Rossi relies on, the attorney signed a client's name to a document without obtaining the client's consent, falsely notarized the signature, and then filed the document with the court or another public office. *See Disciplinary Counsel v. Bush*, 2023-Ohio-4200; *Disciplinary Counsel v. Bryant*, 2021-Ohio-375; *Columbus Bar Assn. v. Craig*, 2012-Ohio-1083.

**{¶ 55}** And in the remaining three cases, the attorneys notarized one or more documents that were not signed in their presence. *See Counsel v. Billingsley*, 2024-Ohio-222; *Mahoning Cty. Bar Assn. v. Melnick*, 2005-Ohio-6265; *Disciplinary Counsel v. Simon*, 1994-Ohio-11.

**{¶ 56}** Rossi's misconduct differed from those notary cases in intent and scope because he intentionally lied to the county court to prevent the judge from learning that his client was violating that court's no-contact order. Rossi also engaged in other serious misconduct not present in the notary cases by implicitly encouraging his client to violate the court's no-contact order and by drafting a nondisclosure agreement that was void as against public policy because it sought to silence the victim of a crime and impede a criminal case.

### 2. A fully stayed suspension is not appropriate here

**{¶ 57}** We have held, "When an attorney engages in a course of conduct that violates [an ethical rule prohibiting dishonesty, fraud, deceit, or misrepresentation], the attorney will be actually suspended from the practice of law for an appropriate period of time." *Disciplinary Counsel v. Fowerbaugh*, 1995-Ohio-261, syllabus. But as we recently explained in *Mahoning Cty. Bar Assn. v. Macala*, 2024-Ohio-3158, "We have tempered the presumptive sanction of an actual suspension for an attorney's dishonest conduct in two sets of circumstances. First, we have done so when an attorney has engaged in an isolated incident of dishonest conduct," *id.* at ¶ 24. "Second, we have recognized that 'an abundance of mitigating evidence can justify a lesser sanction.'" *Id.* at ¶ 25, quoting *Disciplinary Counsel v. Markijohn*, 2003-Ohio-4129, ¶ 8.

**{¶ 58}** We have consistently recognized that "the goal of disciplinary proceedings is not to punish the errant lawyer, but to protect the public." *Toledo Bar Assn. v. Hales*, 2008-Ohio-6201, ¶ 21. And "[w]hile consistency is also a goal, 'we examine each case individually and impose the discipline we believe

appropriate based on the unique circumstances of each case.'" *Id.*, quoting *In re Disciplinary Action Against Ruffenach*, 486 N.W.2d 387, 390 (Minn. 1992).

{¶ 59} Rossi advances no fewer than ten cases to support his argument that if we reject the sanction of a public reprimand, a conditionally stayed suspension is the appropriate sanction for his misconduct. But based on the nature and scope of the misconduct and the relevant aggravating and mitigating factors, the facts and circumstances of this case are readily distinguishable from those of the cases advanced by Rossi.

{¶ 60} For example, in *Disciplinary Counsel v. Harmon*, 2019-Ohio-4171, four members of this court voted to impose a two-year conditionally stayed suspension on an attorney who had committed multiple and serious ethical violations while representing a personal friend and mentor who had been diagnosed with dementia. *Id.* Harmon's misconduct included filing a frivolous lawsuit against his client's family members to harass and embarrass them in an attempt to collect an excessive fee and falsely stating to a magistrate that his client had been kidnapped. The lead opinion noted that Harmon was practicing in an unfamiliar area of the law and that his "emotional involvement and his desire to protect his friend and mentor of more than 40 years clouded his judgment." *Id.* at ¶ 40. While the record here demonstrates that Rossi and Yerkey are friends and that Rossi was Yerkey's landlord at the time of Rossi's misconduct, Rossi has not presented any evidence that his judgment was similarly clouded by his personal relationship with his client.

{¶ 61} We also imposed a conditionally stayed one-year suspension in *Columbus Bar Assn. v. Ryan*, 2024-Ohio-5570. There, the attorney failed to diligently and promptly represent a client, and after the client filed a grievance, the attorney made false statements to pressure the client both to withdraw the grievance and to falsely inform relator that the client would not waive attorney-client privilege or permit the attorney to cooperate with the resulting disciplinary investigation.

{¶ 62} Although Ryan had prior discipline and engaged in a pattern of misconduct, she also made a good-faith effort to make restitution, exhibited a cooperative attitude and submitted evidence of her good character and reputation. We also acknowledged several additional mitigating circumstances that are not present in this case, including (1) Ryan's efforts to complete the client's representation for free, (2) the role that the COVID-19 pandemic played in delaying the client's case, and (3) Ryan's uncertainty regarding her potentially competing duties to cooperate in the disciplinary investigation and to simultaneously safeguard her client's privileged information from falling into the hands of an adverse party. *Id.* at ¶ 16.

{¶ 63} In *Columbus Bar Assn. v. Villarreal*, 2024-Ohio-5165, we imposed a conditionally stayed 18-month suspension on an attorney who failed to provide competent representation to three clients, filed at least three legal proceedings that were unsupported by law or lacked a good-faith argument for an extension, modification, or reversal of existing law, and engaged in other frivolous conduct. Among other things, Villarreal also submitted a client's affidavit to a court knowing that the affidavit contained false statements.

{¶ 64} In a unanimous opinion, we imposed a conditionally stayed 18-month suspension for Villarreal's misconduct. *Id*. at ¶ 36. Although Villarreal was found to have committed more ethical violations than Rossi has committed in this case, she also took full responsibility for her actions, showed genuine remorse for her misconduct, and had paid $48,000 in sanctions levied against her for her dishonest conduct. *Id.* at ¶ 32.

{¶ 65} On these facts, *Villarreal* does not support the imposition of a fully stayed suspension for Rossi's misconduct. Our decisions in four other cases advanced by Rossi—*Disciplinary Counsel v. Byron*, 2024-Ohio-5433; *Disciplinary Counsel v. Moore*, 2024-Ohio-5198; *Columbus Bar Assn. v. Davis*, 2022-Ohio-1286; and *Disciplinary Counsel v. Oviatt*, 2018-Ohio-5091—are similarly

distinguishable on their facts and offer no support for the imposition of a fully stayed suspension here.

*3. A six-month suspension is the appropriate sanction for Rossi's misconduct*

{¶ 66} In his objections, Rossi contends that his misconduct was "less egregious and his mitigation far weightier" than the misconduct and mitigation at issue in *Toledo Bar Assn. v. DeMarco*, 2015-Ohio-4549, but that the sanction imposed in *DeMarco* "is the same punishment that the Board proposes [here]." DeMarco made comments that threatened violence against his own expert witness, deliberately concealed evidence from the court, and initially failed to show remorse for his misconduct. DeMarco repeatedly lied to opposing counsel and the court in an attempt to conceal evidence from the court until confronted with evidence of his deceit.

{¶ 67} The same three mitigating factors that are present in this case were present in *DeMarco*. But in comparison to the three aggravating factors present here, the sole aggravating factor in *DeMarco* was a dishonest motive. There, we found no compelling reason to deviate from the rule that dishonest and deceitful conduct mandates an actual suspension. *Id.* at ¶ 14. We imposed a one-year suspension for DeMarco's misconduct but stayed the final six months of that suspension based on his character references, which indicated that his misconduct "was an aberration in an otherwise unblemished 45-year legal career." *Id.* at ¶ 15. Contrary to Rossi's assertions, a one-year suspension with six months conditionally stayed is a greater sanction than a six-month suspension. And we agree that that sanction is not appropriate in this case.

{¶ 68} After considering the record and our precedent, including each of the cases advanced by Rossi in support of a lesser sanction, we are persuaded that the facts of this case are most comparable to those of two cases the board relied on to support its recommended sanction—*Spinazze*, 2020-Ohio-957, and *Rohrer*, 2009-

20

Ohio-5930. In each of those cases, we imposed a six-month license suspension on an attorney who, like Rossi, interfered in criminal proceedings.

{¶ 69} *Spinazze*, a part-time city prosecutor, offered a plea to a defendant in a criminal matter, agreeing to reduce the charge of operating a vehicle while under the influence of alcohol to a physical-control offense. But when confronted by the judge presiding over the case, Spinazze misrepresented his reasons for offering the plea and falsely claimed that the arresting officers had consented to the plea agreement. Relying on those false representations, the judge accepted the plea. Spinazze then made a false notation on the file and made several misrepresentations to his supervisor in an effort to conceal his misconduct. An acting judge later granted the city's motion to vacate the plea and eventually found the defendant guilty of OVI.

{¶ 70} In addition to the same professional-conduct violations at issue in this case, we found that Spinazze had violated Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). But just one aggravating factor was present in that case—a dishonest motive—while Rossi also committed multiple offenses and refused to acknowledge the wrongful nature of his conduct. Along with the three mitigating factors present here (a clean disciplinary record, cooperation in the disciplinary proceedings, and evidence of good character), Spinazze also had another sanction imposed for his misconduct in that his employment was terminated. *See* Gov.Bar R. V(13)(C)(6).

{¶ 71} And in *Rohrer*, 2009-Ohio-5930, an attorney deliberately directed a staff member to deliver a copy of a motion he had filed in a case to a local newspaper in violation of the juvenile court's verbal order prohibiting counsel from discussing the case with the media. To avoid being removed from the case, Rohrer falsely told the court that his staff had misconstrued his instructions and leaked the information to the media. Then, after firing his assistant for divulging confidential

information, he wrote a letter to the unemployment-compensation bureau falsely suggesting that his assistant was responsible for the leak.

{¶ 72} Rohrer's conduct violated Prof.Cond.R. 3.3(a)(1) and 8.4(d) as Rossi's conduct did in this case, but it also violated Prof.Cond.R. 3.4(c) (prohibiting a lawyer from knowingly disobeying an obligation under the rules of a tribunal), 8.4(c), and 8.4(h) (prohibiting an attorney from engaging in conduct that adversely affects his fitness to practice law). *Rohrer* at ¶ 20-23. The aggravating and mitigating factors were identical to those in this case except that Rohrer, like Spinazze, also had other sanctions imposed for his misconduct. Finding that Rohrer's repeated lies to the juvenile court and his subsequent misrepresentations to the unemployment-compensation bureau "strongly militate[d] against a stayed suspension," we suspended him from the practice of law for six months. *Rohrer* at ¶ 53-54.

{¶ 73} Rossi argues that his misconduct "was nowhere as egregious" as Rohrer's misconduct and emphasizes that Rohrer "showed no remorse" for his misconduct. However, Rossi also fails to acknowledge the seriousness of his own misconduct, which consists not only of making a single false representation to the county court but also includes implicitly encouraging his client to violate a court's no-contact order and drafting a nondisclosure agreement that was intended to thwart the prosecution of a pending criminal case.

{¶ 74} We acknowledge that Rossi has submitted 22 character letters—16 from attorneys, five from judges, and one from a magistrate—declaring that he is a well-respected, dedicated, and zealous advocate who is known for his honesty, strong work ethic, and community service—including his past service as the president of the Mahoning County Bar Association. We find that those letters, combined with Rossi's clean disciplinary record and cooperation in the disciplinary proceeding are insufficient to overcome the misconduct in this case.

{¶ 75} We find that an actual license suspension is necessary both to protect the public and to impart on Rossi the full extent of the wrongfulness of his misconduct. We therefore adopt the board's recommendation that Rossi be suspended from the practice of law for six months. We also adopt the board's recommendation that his reinstatement to the profession be conditioned on his completion of six hours of CLE focused on ethics, professionalism, and the application of Marsy's Law in addition to the hours required by Gov.Bar R. X.

## V. CONCLUSION

{¶ 76} Accordingly, Gregg August Rossi is suspended from the practice of law in Ohio for six months. In addition to the requirements of Gov.Bar R. V(24), Rossi's reinstatement to the practice of law shall be conditioned on his submission of proof that he has completed six hours of CLE focused on ethics, professionalism, and the application of Marsy's Law in addition to the hours required by Gov.Bar R. X. Costs are taxed to Rossi.

Judgment accordingly.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Matthew A. Kanai, Assistant Disciplinary Counsel, for relator.

John B. Juhasz, for respondent.

_____